## PETROLEUM IRON WORKS CO. v. WANTLAND.

### No. 706. Opinion Filed March 21, 1911.

#### (114 Pac. 717.)

1. **MASTER AND SERVANT—Injuries to Servant—Burden of Proof —Circumstantial Evidence.** In an action by an employee for injuries resulting from an alleged negligence of the master, the burden is upon plaintiff to establish the causal connection between the accident and the alleged negligence of the master; but such fact may be established by circumstantial evidence.

2. **SAME—Sufficiency of Evidence—Case.** Plaintiff, while engaged in helping to construct a steel tank, fell from the top round of the scaffold to the floor of the tank, a distance of approximately 23 feet; he held in his hands two wooden benches. The evidence establishes that he fell feet downward and struck the floor outward from the edge of the scaffold toward the center of the tank from four to six feet; that certain braces had been omitted from the scaffold in all the rounds above the first one, from which defects in the scaffold it was caused to swing inward and outward; that the flooring of the scaffold contained planks of varying thickness, some of which were so thin as to cause them to spring upward and downward. Plaintiff was rendered unconscious by the fall, and was unable to remember the cause thereof. There was no eyewitness to the accident until after plaintiff had fallen about six feet. Held. the evidence was sufficient to permit the case to go to the jury for its determination whether the accident was caused by the defects in the scaffold.

(Syllabus by the Court.)

*Error from District Court, Washington County; T. L. Brown, Judge.*

Action by Virgil Wantland, a minor, by J. W. Wantland, his next friend, against the Petroleum Iron Works Company. Judgment for plaintiff, and defendant brings error. Affirmed.

*Shartel, Keaton & Wells* and *Veasey & Rowland,* for plaintiff in error.

*Chas. W. Pennel* and *J. R. Charlton,* for defendant in error.

HAYES, J. This action was begun after the admission of the state in the district court of Washington county by defendant

Vol. 28—31

in error, to recover damages for injuries received by him while in the employment of plaintiff in error. The parties will hereafter be referred to as defendant and plaintiff, respectively.

Plaintiff alleges in his petition, substantially, that he, at the time of the institution of this action, was a minor, 18 years of age; that defendant, on October 16, 1907, was engaged in the business of erecting and constructing large steel tanks in the various oil fields of Oklahoma; that on that date plaintiff was employed by defendant as a riveter on a 35,000 barrel steel tank which defendant was then constructing near Bartlesville; that it became plaintiff's duty in the course of his employment to go upon an elevated scaffold, or platform, on the inside of the tank for the purpose of riveting bolts; that said scaffold or platform had been built by persons inexperienced in scaffold building, and was unsafe, in that the joints were not properly braced, that the braces were too far apart, and that the scaffold extended above the platform on which plaintiff was compelled to work, all of which facts were unknown to plaintiff; that defendant was further negligent in failing to instruct plaintiff of the dangerous condition of the scaffold and the dangers incident to the work, knowing that plaintiff was inexperienced and a minor; and that, by reason of the defective conditions of the scaffold, it tipped and sprang while plaintiff was on the same, in due performance of his duties; and he was thrown therefrom and precipitated about 23 feet upon the steel floor of the tank, severely injuring his foot, hip, and spinal column; and that said injuries have wholly incapacitated him from doing any work whatever, for all of which he prayed damages.

After answer by defendant, there was a trial to a jury, which resulted in a verdict and judgment in favor of plaintiff for the sum of $3,500. On this appeal from that judgment defendant assigns as error for reversal of the cause: First. The overruling of its motion for a new trial. Second. Refusal of the court to peremptorily instruct the jury in its favor. Third. Overruling its demurrer to plaintiff's evidence. These three assignments pre-

sent practically the same questions, and the propositions discussed thereunder by defendant in its brief are placed under two heads, to wit, first, that there is no evidence of any connection between the negligence complained of and the injury; and, second, that the negligence or defect complained of, if any existed, was open and apparent to plaintiff and was assumed by him.

There is evidence tending to establish that the tank was constructed out of rings of metal sheets; that these rings were put up, one on the other, by sections, and the sections of metal were bradded together. The employees, engaged in putting up these sections of the steel worked upon scaffolds built one on the inside and one on the outside of the tank. Plaintiff at the time of the accident was working upon the scaffold built on the inside of the tank; and the tank at that time was practically completed. Plaintiff was then working on the last round of the wall of the tank.

The method of building these scaffolds, as described by the witnesses, in substance, is as follows: They first set up inside of the tank a piece of lumber 2x8, in this instance, 24 feet high; then, next to the tank, a piece of 4x4, as high as the first crosspiece; then an L is nailed across from the 2x8's to the 4x4's; and the 2x8 is then nailed to the next crosspiece by lumber running from the top of one to the bottom of the other; and then from the top of the second to the bottom of the first. Similar crosspieces brace the 4x4's next to the inside of the tank. On the L that goes across from the 2x8's to the 4x4's, the floor of the scaffold is laid around the tank. After the first L is put in, this floor is laid, and the employee rivets on another section of the tank; then by similar method it is built up and the second platform is laid, from which work on the next section is done. In building up the scaffold, all the lumber that is used in bracing it is left, and each new L is braced as it is made; and as the floor is moved up the outside pieces, which are 2x8's extend all the way up at all times. In the instant case the first section of the scaffold was built by a regular scaffold builder, but all the subsequent sections, including the one from which plaintiff fell and which was the last section to be built, were built by members of the roustabout gang,

or . persons without experience in scaffold building. The timbers used for the floors of the scaffold were supposed to be two inches in thickness and eight inches in width, and were made up of three pieces of this timber, lying side by side. There is evidence tending to establish that the upper sections of the scaffold were not braced properly, and that such defect caused the scaffold under certain conditions to swing; and also that the flooring was defective, in that the planks out of which it was made were of varying thickness, ranging from 1½ inches to 4 inches, thereby making the floor uneven and also rendering it, in places where the thin planks lay, of such weakness as to make it spring up and down when the weight of a person or other heavy weight was upon it.

One witness testified relative thereto as follows:

"Q. Pretty good scaffolding, wasn't it? A. Not very; no, sir. Q. Why not? A. It was just the same as the outside scaffolding. Q. Now what was the matter with it? A. There was planks would bow away down, and some was thicker than others. Q. That is, the planks they walked on? A. Yes. Q. Now, any trouble with it, outside the planks they walked on? A. Any what? Q. Any trouble with it? Any thing the matter with it? A. They was thick, and some of them thin; and they would give a whole lot. Q. Outside the planks they walked on, was there anything else the matter with that inside scaffolding? A. Not as I know of, only it was shaky; more than the outside scaffold. The top on the inside scaffold wasn't braced right. There wasn't any braces across at the top. Q. Where was it there wasn't any braces across? A. From the upright to the L."

And the same witness, further testifying, stated that these braces had been omitted throughout the scaffold above the bottom row.

Another witness testified:

"Q. Now, you can tell the jury what the condition of the scaffold was. A. Well, the scaffold wasn't built up the way it ought to have been. It wasn't as really braced up against the tank like it ought to have been. It was upright, if it had been braced right. Some of the L's was away from the tank—kind o' a swinging scaffold."

And further testified relative to the absent braces:

"Q. Do you consider that those boards on the L's are neces-

sary in order to make the scaffold secure and safe? A. Supposed to be; yes. Q. Do you know whether this scaffold on the inside fit up to the shell all the time, or was it sprung out? A. It was like the rest of it. It would spring out a little."

Mr. Puckett testified:

"Q. But you have worked a good deal about scaffoldings? A. Yes, sir. Q. Mr. Puckett, wasn't this really a pretty good scaffolding? A. I don't think it was a very good scaffolding. Q. Well, now, in what respect would you say that it wasn't first-class? A. Well, sir, them boards, one being thick, and one being thin, a man walking around that, and stepping on a thin one from a thick one, would spring down, and is liable to throw him off. Q. Isn't that usual in scaffoldings? A. No, sir."

There is an abundance of evidence tending to establish that the scaffolding was defective, both in respect to the absence of braces and in the irregularity of thickness of the timbers in the floor; from the former of which defects the scaffold was made to swing at times off from the wall, and from the latter defect the floor of the scaffold was made to swing up and down when a weight was placed upon the thinner planks. Plaintiff was working with the riveting gang. His duties at the time of the accident were what is called among builders of tanks "bucking up," which required him to be on the inside of the tank and to hold the rivet while a man on the outside strikes it. It became necessary for plaintiff to go from the point on the scaffold where he was working to a point in the tank, practically opposite therefrom, in order to get what is called a "bucking-up bench" and a "saddle," both of which are made of wood. The former is used to place upon the platform to stand upon, and the other, which is something like a sawhorse, only the legs are shorter, is set upon the top of the edge of the tank to hold up a bar used in holding against the rivet, while the man outside strikes. In going after these benches, plaintiff passed around the tank upon the platform to where they were lying, and picked them up. No one saw plaintiff at the time he began to fall. One witness saw him after he had fallen about six feet; the distance from where he fell to the floor being about 23 feet. At the time this witness

saw him, plaintiff was falling both feet downward and struck the floor in that position. He fell, not directly under or even with the edge of the scaffold, but from four to six feet outward from the edge of the scaffold toward the center of the tank. He was unconscious when picked up, and remained so for several hours thereafter, and does not himself remember how he came to fall. That he fell with his feet downward and out from the edge of the scaffold is testified to by other witnesses also.

The two facts proven upon which plaintiff relies as not only authorizing, but compelling, the inference that plaintiff was thrown from the platform, either by the inward and outward swinging of the scaffold or by the upward or downward motion of the platform, are, first, that plaintiff fell with his feet directly downward; and, second, that he fell out from the edge of the platform five or six feet. It is not necessary to concur in his contention that such a conclusion is inevitable from the evidence. It is sufficient that we cannot say that such an inference is not one that might be drawn by reasonable men from this evidence. Had plaintiff stepped off the platform, the missing of one foot from the platform and the throwing of his weight upon that side of his body, as is done in walking, would have almost unavoidably so unbalanced his body as to have made him turn in falling, instead of falling erect, with his feet downward; and especially would this have resulted when it is considered that he had upon his shoulders the extra weight of the benches. With this weight upon him, it would have been almost impossible for him to have turned a complete somersault in the first six feet of his fall, so as to have been in the position when he was first observed while falling; and, had his head ever reached a downward position in the fall, with the extra weights in his hands, it would have been highly improbable for his feet to have ever got under him again. Plaintiff being a sane person, and there being no motive for his doing so, it is not reasonable to infer that he jumped intentionally off the platform. A jury composed of men of varied experience and observation may have inferred that by the swinging of the platform plaintiff found himself in an unbalanced position,

from which he was forced to jump, or did so involuntarily, in obedience to the instinct of self-preservation, when from his unbalanced position it occurred to him that he must jump or be thrown upon his head; or that by the swinging of the scaffold the floor was thrown from under him, and he fell.

Defendant insists that there is no evidence tending to show that at the exact point where the fall occurred the scaffold was defective, but this contention is not sustained in its entirety by the record. Some of the witnesses testified that above the first section of the platform necessary braces were left off the L's, and that this omission gave to the scaffold a swinging effect, which increased as the height of the scaffold increased; and that the thin planks were scattered at different places in the floor throughout the scaffold. Whether, however, there was any of these planks at the exact point from which plaintiff's fall began there is no evidence and there cannot be said to be any direct evidence connecting the accident with the negligence of the company; but this happens in many accidents, which from the nature of the case, renders it impossible to establish the causal connection by direct evidence; but it may be shown by circumstantial evidence.

It is ordinarily the province of the jury to determine whether the negligence of the master is the natural and proximate cause of the injury complained of (*Hartvig v. N. P. Lumber Co.*, 19 Or. 522, 25 Pac. 358), and, where there is doubt as to which of several probable causes produced the injury, the cause of the injury is properly a question for the jury. *Elliff v. Oreg. R. & N. Co.*, 53 Or. 66, 99 Pac. 76. The court will not weigh conflicting evidence or the inference that may be reasonably drawn therefrom. The burden of proof in an action of this character is primarily upon plaintiff to prove the negligence charged, and also that the accident from which he received the injury had a causal connection with such negligence charged; and, failing in either of these essentials, the court is authorized to take the case from the jury. But the causal connection is not required to be

established by direct proof. It may be inferred from circumstantial evidence. Negligence in the method of constructing the scaffold has been shown; and there are circumstances surrounding the fall from which reasonable men might infer that the fall was brought about by this defective construction; and we do not think the court erred in refusing to take the case from the jury, or in refusing to grant a new trial upon this ground.

Section 6, art. 23, of the Constitution provides: "The defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact, and at all times be left to the jury." It has not been questioned in this court, and it appears not to have been in the trial court, that this provision of the Constitution was applicable to the case at bar; nor has its validity been attacked. Acting under the mandate of this provision, the trial court was clearly within the law when he refused to take the case from the jury upon the ground that plaintiff's injuries were received from a risk assumed by him. Plaintiff at the time of the accident was a boy, 17 years of age. He had worked about this tank for a period of six weeks, but had been engaged in the duty of a holder-on or in bucking up at intervals during only a period of two weeks. He states positively that he did not know of the defects in the scaffold; and it is further shown that it was customary for companies engaged in the building of such tanks to post up or give rules of instructions, instructing employees not to carry loads upon the scaffold, such as plaintiff was attempting to carry at the time of his fall, but that such instructions had not been given in this case. Whether plaintiff knew of the defects complained of, or, if he did, on account of his immature age and brevity of experience in this work, he was not fully capable of understanding and appreciating the dangers thereof, was properly for the jury to determine.

Finding no error in the record requiring a reversal of the cause, the judgment of the trial court is affirmed.

All the Justices concur.