## ST. LOUIS & S. F. R. CO. v. DARNELL, *Adm'x.*

### No. 3263.   Opinion Filed June 23, 1914.

#### (141 Pac. 785.)

1.  **NEGLIGENCE—Proximate Cause—Question for Jury.** In a suit for personal injuries the question of whether or not defendant's negligence is the proximate cause of the injury sustained should be left to the jury, where the evidence is conflicting, or where men of ordinary intelligence might differ as to the effect of the evidence on the point.

2.  **SAME—Circumstantial Evidence.** The question of proximate cause may be determined from circumstantial evidence.

(Syllabus by Brewer, C.)

*Error from District Court, Oklahoma County;*
*Geo. W. Clark, Judge.*

Action by Myrtle Darnell, administratrix, against the St. Louis & San Francisco Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

*W. F. Evans, R. A. Kleinschmidt,* and *J. H. Grant,* for plaintiff in error.

*V. E. McInnis, A. F. Moss, J. W. Hassell,* and *M. E. Turner,* for defendant in error.

Opinion by BREWER, C.   On or about April 5, 1910, W. C. Darnell, while in the performance of his duty, as head brakeman, fell from defendant's train and was killed at a point about one mile north of Scullin, Okla. The said train was being run from Francis, Okla., to Sherman, in the state of Texas, and was engaged in interstate business.

This suit is brought by Myrtle Darnell, his widow, in her capacity as administratrix of the estate of her deceased husband. It is claimed that the deceased lost his life because of the negligence of the defendant railroad, and the allegations of negligence are, in substance, as follows:

"Plaintiff further shows that on said date, and for a long time prior thereto, the defendant had allowed its track at points between Hickory and Scullin  *  *  *  to become rough and uneven, with swags, depressions, and low joints in its rails, and that the ties to which the rails of said track were attached were old and rotten, defective, and insufficient to hold said rails, and that said track was defectively, insufficiently, and negligently ballasted, and at various points was unballasted so that the ties holding said rails, by reason of their rotten, defective, and negligent condition, and by reason of said track being negligently ballasted, had slipped and would slip out of alignment; and plaintiff further shows that by reason of such negligent construction of said railroad bed, ties, and rails, said track had become rough, uneven, out of alignment, and with low points and depressions, at a point halfway between milepost 570 and said defendant's right of way and defendant's whistling post, as defendant's line approached Scullin from the north;  *  *  * that said negligent condition of the defendant's railroad bed, ties, and track negligently existed on April 5, 1910, at the time of the accident hereinafter set out, and had so existed for a long time prior thereto, and that defendant knew of said negligent condition, or, by the exercise of ordinary care, could have known it, and could have remedied the same, and thereby have prevented the accident and injury hereinafter set out."

The above allegation is followed by a general averment that deceased was in the line of his duty, and that it was necessary to pass along the top of the cars constituting the train, and from one car to another, in order to perform his duty and carry out his instructions, and then follows with the following allegation:

"Plaintiff further shows that as said train passed along over defendant's line, as aforesaid, as it approached Scullin and as it passed along toward defendant's milepost 570 and its whistling post as it approached the station of Scullin from the north, the said W. C. Darnell, without negligence on his part, was passing over and along the top of said train as aforesaid; that said train was being negligently operated at a high and excessive rate of speed over said rough and uneven track, to wit, at the rate of 35 miles per hour; that W. C. Darnell was passing toward the head end of said train, and was in the act of climbing, stepping across from one car to another;  *  *  * that, as said Darnell attempted to cross over, said train, while being operated by the agent, servants, and employees of the defendant, ran over said rough track, and into and over

said depressions, and, by reason of said excessive speed and by reason of said rough, uneven, and negligently constructed railroad bed, track, and ties, the said Darnell was thrown from said train, and was, without his negligence, and through the negligence of the defendant, its agents, servants, and employees, immediately and instantly killed."

The defendant, for answer, filed a general denial and set up the defense of contributory negligence and assumption of risk.

The plaintiff filed a general denial for a reply. At a trial on the issues thus formed the jury returned a verdict for the plaintiff, and the defendant brings the case here as plaintiff in error, and argues three propositions: (1) That the evidence fails to support the verdict; (2) the refusal of competent evidence; and (3) the admission of incompetent evidence.

The instructions of the court, it will be noted at the outset, are not challenged by either party, and we are therefore justified in assuming that the jury was correctly instructed on the various phases of law applicable and involved in the case.

From a careful reading of the briefs it is apparent that the defendant relies for a reversal upon the first point mentioned above; that is, that the evidence does not support the verdict. And this point is still further narrowed to the precise claim that the failure of proof consists in that it does not show that defendant's negligence was the proximate cause of plaintiff's death. It is not contended, and the contention could not be successfully maintained under the evidence, that defendant was not negligent in the maintenance of its railroad at the place where the injury occurred. There is an abundance of evidence that in this respect the defendant was negligent. So our inquiry is reduced to this: Is there a causal connection between defendant's negligence and Darnell's death? If there is not, the verdict is wrong, for it has been often held that, although the defendant may be guilty of negligence, yet to make it liable to a person for injuries received, it must be further shown that the negligence had a causal connection with the injury; that is, that it was the proximate cause of the injury. *St. L. & S. F. R. Co. v. Hess,* 34 Okla. 615, 126 Pac. 760, and cases cited.

With this situation of the facts and the law in mind, we have studied the evidence quite carefully, and are convinced that there is evidence tending to show that defendant's negligence was the underlying cause of the injury; that is to say, that there is evidence which, taken with the rational inferences to be drawn from it, tends to show that but for the condition in which defendant had permitted its track to get plaintiff would not have fallen from the train and thus lost his life. If there was such evidence before the jury, then its weight and effect was to be determined by them. The question of proximate cause is usually to be determined by the jury. *Petroleum Iron Works Co. v. Wantland,* 28 Okla. 481, 114 Pac. 717.

Plaintiff's evidence shows that at the point of the injury, and for a distance of a few hundred feet behind the place where the brakeman fell to his death, the roadbed was in a very bad condition. There were low joints on each side of the track scattered along. Many ties were so rotten that a witness says he could have torn loose and gathered up with his hands a wagon load of fragments from ties in service under the rails. A cracker box full of rotten ends and pieces, thus gathered, are in evidence. There is evidence that ties had rotted from under the rails so that they would sink in places as the train passed over them, and in pressnig down on the loose ties, mud and slush would be forced up over the ties and rail. Darnell fell to his death evidently just as the train was leaving this rough and uneven track. His body was a few yards south of where the bad condition stopped, but there is evidence that the body dragged. The bad condition at this point had been recognized by defendant, as the train carried orders not to exceed fifteen miles an hour. The conductor in charge admits the probability that the train at this point was exceeding its speed orders. He says the train was going fifteen to eighteen miles an hour. It would not be fair or reasonable to infer, considering his relations to defendant, and more particularly to the accident, that he overestimated the speed. About the time the train ran onto this piece of bad track a witness was driving along in a buggy, along the side of the right of way in the same direction the train was going. He was, in a sense, an eyewitness to the injury. It was after dark, and he could not see all that happened, and could

not testify as to the exact position of deceased at the moment of, or the movement resulting in, the false step that caused him to fall between the cars. The train came up behind witness, and appeared from its noise to be running smoothly until it struck this rough place. As the train passed witness saw a man walking on top towards the engine. He could see the man's bulk and his lantern, and when the train was a few car lengths past him he saw the lantern fall. Witness drove on opposite where the lantern fell, and stopped and went onto the track, and, as he expected, found the deceased lying mostly between the rails dead, and his body cut to pieces. We set out some of the testimony of this witness brought out on cross-examination:

"Q. And you just judged that he was at the end of the car from the fact that he fell? A. Yes, sir; that's my judgment. It looked to me like he was trying to make a leap from one car to another. Q. As he proceeded along the train, did you notice any difference in the elevation of his lantern? A. No, sir; I didn't notice until he went to fall, any more than it looked like he was in a sort of a hurry going down the car. Q. This noise that you heard, is that a noise ordinarily made by a freight train as it goes down the road? A. Not altogether; just when it struck the bad places. Q. Didn't you say on your direct examination that you thought from the noise some of the trucks were off the track? A. Yes, sir; I thought maybe some of the trucks had jumped off from the noise. From the rocking disposition, I have seen them jump off of the track very often * * * Q. Now, when did you notice this noise with reference to the time you saw the lantern fall? A. Well, it was right about that time; just a little before the lantern fell it was making this racket. Q. At the time the lantern fell it was not making the racket? A. No; it was still making the racket, but soon got over that. Q. And this racket was heard about simultaneously with the falling of the lantern? A. Yes, sir; just a little bit before. Q. And before that time it had been running smoothly you said? A. When it came up it looked like it was running pretty smooth. Q. Where did you stop with reference to the point where you saw the lantern go down? A. I stopped right about where I thought the lantern fell. Q. Did you find the lantern? A. No, sir; I never paid no attention; I just looked and stepped up and down the track and saw the man lying there. I looked up the track first and then down the track, and saw

a small bulk there, and walked down to it.  Q. Was the man dead when you reached him?  A. Yes, sir; I judged he was dead.  I didn't go right up to him."

Now, taking the condition detailed, and of course we have not brought out here all the little points and bits of evidence bearing on it, what impression is left on the ordinary mind as to why the brakeman fell between the cars?  Did he simply miscalculate his step or miss his footing, uninfluenced by the unusual rocking, jolting, and swaying of the train?  Or did this unusual condition cause the misstep or false movement which precipitated him to his death?  He was an experienced and skilled brakeman. More than one letter from his superintendent testifies as to his thoughtfulness and care.  It seems to us that the facts and circumstances shown tend to convince the mind, and this is the office and purpose of proof, that the great probabilities are that the brakeman lost his balance, his footing, or made the false movement which caused the fall, because of the unusual and unnecessary movement of the train at the time.  If so, this unusual and unnecessary movement was caused by the condition of the track.  The condition of the track was negligence.

It is true that in determining the precise point of "proximate cause" we must depend on the circumstances; but this can be shown by circumstantial evidence.  *Coalgate Co. v. Hurst,* 25 Okla. 597, 107 Pac. 661; *St. L. & S. F. R. Co. v. Rushing,* 31 Okla. 231, 120 Pac. 973; *C., R. I. & P. Ry. Co. v. Ashlock,* 36 Okla. 706, 129 Pac. 726; *Petroleum Co. v. Wantland,* 28 Okla. 481, 114 Pac. 717.

In the Rushing case, *supra,* this court said:

"A plaintiff in a civil case is not required to prove his case beyond a doubt.  All that the plaintiff upon this branch of the case was required to do is to make it appear to be more probable that the injury came in whole or in part from the defendant's negligence than from any other cause."

It is argued that to reach this conclusion we must build inference upon inference, and that in the end it is mere speculation. We do not think so.  We think the evidence shows a negligent condition in the track; that the train in going over this place rocked and was moving in an unusual and unnecessary manner,

because of the negligent condition in the track. These being proven facts, it is only necessary to draw inferences or conclusions from them as to what caused the fall. The jury drew the conclusion, or inference of fact, from the circumstances shown, that the negligence of the company in not properly maintaining its roadbed, coupled, perhaps, with the negligent speed of the train in passing over this particularly bad place, was the underlying, responsible, and efficient cause of the brakeman's fall, and therefore of his loss of life. There is evidence sufficient to sustain this view without invading the realm of mere guesswork or speculation, and appellant's contention must be overruled.

2. A number of objections are presented in the brief, relative to the admission and rejection of evidence. One objection goes to the admission in evidence of the box of fragments of the rotten ties pulled off by hand at the place of injury. No authorities are cited to sustain the objection. The charge in this case was that the roadbed was in a dangerous condition, and that because of the rotten and worn out ties upon which the rails rested. The evidence shows that some of the ties were utterly worn out, rotten, and worthless; and the pieces shown the jury were pulled off these ties, outside the rail, as the witness passed along over this place on the track. The witness said he could have torn off much more had he cared to. We think the evidence tended to prove the charge in the petition, and can see no error in allowing this evidence. The following objection is taken from appellant's brief:

"Q. From your experience as a section man, please state whether or not a low joint of one-half inch caused by ties is considered safe or dangerous by railroad men for the operation of trains over it? A. Why, I couldn't say how section men would call, because you can find low joints all the way along in some places. A real bad low joint, where they find one of those, as a general thing they fix it up.

"Mr. Grant: The defendant moves to strike out all of the testimony of this witness relating to the condition of this track, for the reason that this answer shows conclusively that he has no knowledge of what is a good track and what is a bad track, and says that he does not know what a section man would call a safe track.

"The Court: Overruled.

"Mr. Grant: Exception."

This refusal of the court to sustain this request to strike out all the evidence of the witness is not well taken. The record shows that eleven pages of the evidence had been given by this witness. He described in detail the physical condition of this piece of track; the kind of ties, some new, some old and rotten; that there were low joints, and ties without ballast, etc. Very little of his testimony was opinion evidence. It related in the main to what he saw and knew. Complaint is also made that this condition having been seen by the witness two weeks after the injury is too remote. We do not think so. It might not have had as much probative value as an examination on the next day after the injury; but ties do not rot and become worthless in two weeks' time; nor would their condition materially change in this regard in so short a period.

We think it would not be profitable to notice in detail all the points made under this head; it would unnecessarily lengthen this opinion and serve no good purpose. We have examined them all with care, and can see no real substantial error in the rejection or admission of evidence.

The cause should be affirmed.

By the Court: It is so ordered.