# CLINTON & O.'W. RY. CO, v. DUNLAP.

### No. 6657. Opinion Filed March 28. 1916.

#### (156 Pac. 654.)

1. **NEGLIGENCE—"Actionable Negligence"—Elements.** To consti-
tute actionable negligence. where the wrong or injury is not will-
ful or intentional, three elements are essential :. (1) The existence
of a duty on the part of the defendant to protect the plaintiff from
injury; (2) failure of the defendant to perform that duty; and
(3) injury to the plaintiff resulting from such failure.

2. **SAME—Actions—Questions for Jury.** In a suit for personal in-
juries the question of whether or not defendant's negligence is the
proximate cause of the injury sustained should be left to the jury,
where the evidence is conflicting, or where men of ordinary intel-
ligence might differ as to the effect of the evidence on the point.

3. **SAME—Proximate Cause.** Although the defendant may be guilty
of negligence, yet to make it liable to a person for injuries received
it must be further shown that the negligence had a causal connec-
tion with the injury; that is, that it was the proximate cause of
the injury.

4. **DEATH—Actions for Causing Death—Proximate Cause.** (a) In
actions for negligent death, before the verdict for the plaintiff can
be sustained, the plaintiff must not only prove negligence. but
must also show that such negligence was the proximate cause of
the death. (b) Generally it is impossible to make such proof by
direct and positive evidence, and so the law says it is sufficient
to show the manner and circumstances of the occurrence and all
the accompanying surroundings. as well as the results therefrom,
if the inference they draw therefrom is a reasonable one. .

5. **MASTER AND SERVANT—Injuries to Servant—Actions—Suffi-
ciency of Evidence.** In an action for personal injury resulting in
death. plaintiff introduced evidence to the effect that the deceased.
his person and clothing being wet with perspiration, went upon
wet ground, holding in his hand an extension cord to which was
attached a burning electric light lamp or globe; that, thus holding
the cord up to his breast with his hands in a taut condition, he .
suddenly became lifeless. Upon the part of the defendant evidence
was introduced showing conclusively that the current of elec-
tricity in the wire at the time the party met his death was ap-
proximately 110 volts. Following four experts testified in behalf
of defendant that 110 volts of electricity were not dangerous and

would not kill under any conditions, and that all voltage under 500 volts was not dangerous. This evidence was not contradicted or discredited by the plaintiff. **Held**, a verdict for the plaintiff is not supported by the evidence.

(Syllabus by Mathews, C.

*Error from Superior Court, Custer County;*

*J. W. Lawter, Judge.*

Action by Mrs. Harry Dunlap against the Clinton & Oklahoma Western Railway Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded for new trial.

*Asp, Snyder, Owen & Lybrand* and *Geo. T. Webster,* for plaintiff in error.

*A. J. Welch* and *J. M. Shackleford,* for defendant in error.

Opinion by MATHEWS, C. This action was instituted by Mrs. Harry Dunlap, widow of Harry Dunlap, for the benefit of herself and minor children, to recover damages from the defendant arising from the alleged negligence of said defendant causing the death of the said Harry Dunlap. The parties hereto will be designated as in the trial court.

On July 13, 1913, the said Harry Dunlap was employed by the defendant railway company as a boiler-maker in its shops at Clinton, Okla., and at the time of his death was engaged in repairing a boiler. In this employment it was necessary for him to work-inside a certain boiler, and for the purpose of providing a light therein there was furnished him an incandescent electric light, the globe of which was attached to a free extension cord about 25 feet long. About a quarter to six in the evening he came out of the boiler in which he had been working sev-

eral hours, and brought the extension cord and electric light globe, which he retained in his hand. He then went to a cast-iron water pump near by in the building, and was then heard to make a noise, and was then observed by several parties in the building to be leaning against the water pump with the extension cord in his left hand, his right hand covering the left, and both drawn up to his breast. The cord was snatched out of his hand, and he was then laid down on the ground in a lifeless condition. It was a hot day, and he and his clothing were wet with perspiration, and the ground upon which he was standing at the time of his death was also wet.

It is plaintiff's contention that the deceased was killed through the negligence of defendant in not furnishing him a reasonably safe place in which to work and reasonably safe tools and appliances with which to work.

The defense interposed in the answer was: (1) A general denial; (2) that the voltage on the wire was not sufficient to kill; and (3) that the deceased assumed the risk of the employment.

At the trial the jury returned a verdict in favor of plaintiff for $7,000. The motion for a new trial was overruled, and the defendant prosecutes this appeal.

In the case of *C., R. I. & P. Ry. Co. v. Brazzell*, 40 Okla. 460, 138 Pac. 794, it is said:

"To constitute actionable negligence, where the wrong or injury is not willful or intentional, three elements are essential: (1) The existence of a duty on the part of the defendant to protect the plaintiff from injury; (2) failure of the defendant to perform that duty; and (3) injury to the plaintiff resulting from such failure."

There is no contention but that it was the duty of the defendant to use ordinary care to furnish deceased a safe place in which to work and ordinarily safe tools and appliances with which to work. As to the failure of the defendant to perform that duty there was much conflict in the evidence. While the defendant contended that the extension cord furnished deceased was in good condition and properly insulated, so that it was impossible for the deceased to have come in contact with the charged wire, yet the plaintiff produced evidence to the effect that the extension cord used by the deceased at the time of his death was badly worn and frayed, and that the employees of defendant had frequently received electrical shocks while handling this same cord prior to that time. There was ample evidence to sustain the finding of the jury on this point, but the serious question raised by the defendant is the sufficiency of the evidence to sustain a finding that the death of the deceased resulted from an electric shock. As this is the dominant question in the case it will be necessary to review the evidence on this point at length.

The evidence introduced by plaintiff thereon was that plaintiff at the time of his death held the extension cord in his hand, and that both hands were drawn tensely to his breast; that the person of the deceased and the clothing worn by him at that time were wet with perspiration, and that he was standing on wet ground leaning against a cast-iron pump at the moment of his death; that the foreman of defendant's shop, in which deceased was working at the time he met his death, immediately after the occurrence informed the wife of the deceased that her husband had been killed by electricity; that he sent a telegram, in about 30 minutes after the occurrence, wherein

he stated that Harry Dunlap was killed; that early the next morning he told a party over the phone that the deceased was killed by electricity; the foreman testified that at the time the deceased was expiring he believed he was getting an electric shock, and that he jerked the wire out of his hand.

The general manager of the defendant railroad, as a witness for plaintiff, testified that he was present at the time of the occurrence, and that he jerked the wire from the hands of the deceased because he believed at that time that he was getting a shock, and that he did not change his mind thereon until he had an examination of the plant made the next morning; that as he jerked the wire from the hands of the deceased he thought he got a shock himself. He also phoned to a physician immediately after Dunlap's death to come down to see a man that had been shocked.

The undertakers who prepared the body for burial testified that the law required them to keep a record showing the cause of death and the name of the attending physician, and the record produced by them showed the cause of death to be "electric shock," and that they received the information as to the cause of death from the attending physician.

Another employee of defendant testified for plaintiff that he arrived at the shop a few minutes after the death of the deceased, and that they were talking about Harry Dunlap getting killed, and they said that he was killed by electricity.

The plaintiff and two other witnesses testified that the next day they noticed a mark across the back of the

left hand of the deceased which appeared to be a blister burn.

A witness who was foreman of another railroad shop testified for plaintiff that all the more modern and safely equipped shops had discarded the extension cord electric light four years before that time, for the reason they were found to be dangerous.

To meet this evidence the defendant introduced the superintendent of the electric light plant at Clinton, who testified that he was a graduate of an electrical school, and had been engaged in electrical engineering since 1906; that the municipal plant furnished the current for defendant's shop, and that early on the morning succeeding the death of Harry Dunlap he made an examination of the electrical equipment and appliances in the shop; that he tested the wires in the building to ascertain if there was any high-voltage current, and that the test lamp showed that there was no excessive current; that the volt meter registered 117 volts on one side of the current and 112 on the other; that this is the current supplied for the use of the inhabitants of Clinton, and is the voltage of current which the customers may handle safely; that the ordinary current used in incandescent lamps and in homes is 110 volts, and that this current is transmitted over the low-voltage wires; that the electric current is "stepped down" from the high voltage carried by the primary wires to the low voltage supplied for lighting purposes over the secondary wires by a transformer, which is composed of two coils in one of which passes the high-voltage current, and this induces a current in the other coil of low voltage; that there is no connection between the two coils, and the high voltage stops at the transformer; that in order to prevent the sec-

ondary wires becoming charged with high-voltage in case
of contact between the two coils in the transformer, or in
case a high-voltage wire should come in contact with a
low-voltage wire distributing the current for domestic
use, a "fuse" is used which is made of a substance
that burns up when a high-voltage current is trans-
mitted through it; this fuse is generally of lead and
about two inches long, and when it burns or "blows"
a break in the circuit occurs, and all lights on that circuit
go out; that, if there had been connection between the pri-
mary or high-voltage wire and the secondary or distribut-
ing wire that carried the current in defendant's shops, the
"fuse" would have burnt out, and this would have stopped
the current; that he examined the fuse at the connection
in defendant's shop the following morning after the death
of Harry Dunlap, and the same was in place and in per-
fect condition; that the fuse will burn out when the cur-
rent is increased about double or less; also on the morning
following Dunlap's death that he examined the wires from
the shop back to their origin, and found that there was no
contact between the wires of the circuit supplying the
shops of defendant and the high-voltage wires. This wit-
ness further testified that, while a voltage of 500 was dan-
gerous, it was improbable that less than 1,000 volts would
kill any one; that it depended largely upon one's physical
condition, particularly the condition of the heart; that he
had received a 500-volt circuit without any serious conse-
quences; that 110 to 120 volts were not considered danger-
ous; and that workers frequently took such current volun-
tarily with their naked hand to determine which were the
live wires. This witness gave further testimony to the
effect that, where a person receives an electric shock severe

enough to damage him, burns will appear where the current entered and left the body. He also testified that the fuse is built to carry a rated amount of current, and, whenever the voltage rises sufficient to force through about twice the current of its rated capacity, the fuse will burn out, and that an incandescent lamp will burn out when a current a little above its capacity is forced through it.

W. R. Thompson testified for the defendant that he had been for the past two years in the electrical supply business, and had previously worked in the telephone business as a telephone engineer for nine years; that he did the wiring in the defendant's shops at Clinton, and the current introduced into said shops was the ordinary 110-voltage alternating current used for lighting purposes throughout the country; that on the morning after the death of Dunlap, with witness Stone, the superintendent of the Clinton municipal electric light plant, he went to the transformer that feeds the shop district and examined the wires from there to the shop, and found that they were not in contact with any high-voltage wires; that a test of the wires in the shop showed about 115 volts; that they then cut the current out of the shop, and tested the wire in the shop, and found the same clear of current; that an electrical current must be as high as 1100 volts before it is dangerous to work with; that when a person receives an electrical shock it leaves a burnt or calloused place at place of contact.

F. J. Meyer, for the defendant, testified that he had been an electrical engineer since 1906, and that he was a school graduate therein, and that he was general electrician for the Gas & Electric Company at Oklahoma City; that the customary voltage furnished for domestic use

runs from 105 to 120 volts, and is considered perfectly safe—not dangerous to life; that a voltage of 500 taken under favorable circumstances, where the conditions are favorable for the least resistance of the body against the electrical current, is considered dangerous, and may be fatal, but that 120 volts is not considered fatal, and that 110 volts is considered perfectly safe; that, where a person receives a serious electric shock, it leaves a burn at the points of contact and exit; that it is not dangerous for a person to receive the 110 or 120 volts used for domestic purposes under favorable circumstances; that whenever a person is injured by the low-voltage wires it is caused by the high-voltage wires coming in contact with said low-voltage wires; that an electric light lamp of 110 volts will not stand much higher voltage than 110, and when it gets a higher current it will get much brighter, and then burn out, and that it is impossible for high voltage to force the current through the light without burning it out; that, if there was any electric current over the wire at the shop sufficient to cause death, there must have been a contact between that wire and the high-voltage wires, and, if such a current passed through the lamp, it would burn out, and, if it passed through the fuse at the transformer, it would have burned out, and, if it passed through the fuse at the shop, that fuse would have burned out.

George Knox, for the defendant, testified that he was an electrical engineer of 25 years' experience, and was manager of the Oklahoma City Street Railway Company; that he had constructed electric light plants in numerous cities; that a current of 115 to 120 volts, commonly used for domestic purposes throughout the country, is considered safe; that from 800 volts upward is considered dan-

.gerous; that he did not think it possible for 120 volts to cause death to a person standing on wet ground and taking hold of the wire with sweaty hands, his body being wet; that a person holding in his hands a light charged with sufficient current to cause serious injury or death would have marks on his hands at place of contact, and, if he was standing on damp ground, there would be marks on his feet where the current left the body; that it would not be possible for a person standing on moist ground, his hands, clothing, and person moist from perspiration, and who had worked the entire day in a repair shop, to be killed by receiving the entire current from a secondary domestic wire.

Three parties who were the undertakers who prepared the body for burial testified for the defendant that they examined the body and discovered no burns, marks, or discoloration on the body of the deceased.

The case of *Myers v. Portland Ry., Light & Power Co.*, 68 Or. 599, 138 Pac. 213, is cited as supporting plaintiff's contention. In the cited case the defendant light company at the time of the death of the party killed was testing new machines, using wooden tanks filled with water in which there were 2,300 volts of electricity being injected; it was the duty of the deceased to throw salt in the water for the purpose of increasing the resistance to the current; the decedent had not been out of view two minutes before he was found near one of the tanks dead; and water had run over the tanks and wet the ground where the deceased was found. The court held that these facts were sufficient to present a question for the jury whether the death was caused by an electric shock. But in that case there was no controversy but that 2,300 volts

of electricity were deadly; while in the case at bar it was proven that approximately 110 volts were not dangerous. In that case there was present an agency capable of inflicting death, while the same is lacking in the case at bar.

In the case of *St. Louis & S. F. R. Co. v. Darnell, Adm'x*, 42 Okla. 394, 141 Pac. 785, cited by plaintiff, the same distinction is found. In that case the deceased was killed by falling from a moving freight train, and, the plaintiff having proven that the track where the accident occurred was rough and uneven, it was held that it was a question for the jury to decide whether or not the condition of the track was the proximate cause of the accident. The track was in a bad condition, and could have been the proximate cause of the accident, a question correctly for the jury, but in the case at bar the evidence was uncontradicted that at the time of the death of Dunlap the wire only carried approximately 110 volts, and that the same were not sufficient to cause death, so there was nothing for the jury to pass upon on that point. In the first paragraph of the syllabus of the case last cited is found this significant language:

"In a suit for personal injuries the question of whether or not defendant's negligence is the proximate cause of the injury sustained should be left to the jury, where the evidence is conflicting, or where men of ordinary intelligence might differ as to the effect of the evidence on the point."

In the case of *St. Louis & S. F. R. Co. v. Darnell*, 42 Okla. 394, 141 Pac. 785, it is said:

"It has been often held that, although the defendant may be guilty of negligence, yet to make it liable to a person for injuries received it must be further shown that the negligence had a causal connection with the injury; that is, that it was the proximate cause of the injury. *St. L.*

& S. F. R. Co. v. Maud Hess, 34 Okla. 615, 126 Pac. 760, and cases cited."

In this case the plaintiff has made no effort to prove that the current of electricity in the wires supplying defendant's shop at the time of the death of Dunlap was in excess of that commonly used for domestic purposes for ordinary lighting service, and neither was there any attempt made to attack or discredit the testimony of defendant to the effect that upon an examination, on the morning following the death of Dunlap, by two electrical experts, the wires running into the shop were found to be in normal condition, that in no place were they in contact with high-voltage wires, and that the fuses at the transformer and in the shop had not burned out, and neither had the incandescent lamp which the deceased had in his hand at the time of his death. As near as human testimony can be accepted as conclusive upon any fact, it appears to us that the defendant has demonstrated that the voltage of the current in the wires in defendant's shop at the time of Dunlap's death was approximately 110 volts. It was given in evidence, which no attempt was made to discredit, that a 110-volt incandescent lamp will burn out if a current of much higher voltage is forced through it; also that the fuse will burn out if a current about double its capacity goes through it. From the proof introduced on this point it must be taken as an accepted fact that Dunlap at the time of his death could not have received a current much in excess of 110 volts. This being true, the question that next confronts us is: Is it a fair and reasonable inference from all the facts and circumstances in this case that the proximate cause of the death of Harry Dunlap was the shock received by him from the wire held in his hand at the time of his death? In discussing this

·question it will be accepted as a proven fact that defendant was negligent in furnishing deceased an extension cord upon which the insulation had become so worn as to permit his hand to touch the wire and thereby receive the ·current, because the jury must have so found in order to· reach the verdict returned, and there is sufficient evidence to warrant such a finding, but before the verdict for the plaintiff can be sustained the plaintiff must go further than simply proving negligence, and must also show that such negligence was the proximate cause of the death of Dunlap. Generally it is impossible to make such proof by direct and positive evidence, and so the law says it is sufficient to show the manner and circumstances of the occurrence and all the accompanying surroundings, from which the jury may infer the cause of the accident as well as the results therefrom, if the inference they draw therefrom is a reasonable one. *St. Louis & S. F. R. Co. v. Clampitt,* 55 Okla. 686, 154 Pac. 40.

From all the facts and circumstances proven in this case, is it a reasonable inference that the death of Dunlap was caused by an electric shock? We are constrained to answer in the negative. We are not unmindful of the fact that the verdict of a jury which has met the approval of the trial judge should not be set aside or disregarded by this court unless it appears that there is a clear absence of proof to support the verdict.

The substantial evidence upon the part of the plaintiff was that Harry Dunlap was apparently in good physical health, and after working for quite a while on a hot day in a certain boiler, and, being wet with perspiration, went upon wet ground, holding in his hands an extension electric light cord; worn and frayed, charged with electricity, and

with his hands drawn up to his breast, immediately life became extinct. The testimony that the general manager and employees present at the time of his death thought and said that his death was caused by electric shock can have but little probative weight, because it is evident that they at that time did not and could not have known the real cause of the death. At that time such a conclusion was only the merest surmise and conjecture hastily arrived at under exciting conditions.

It is a serious question if the afore-mentioned evidence was sufficient to overcome a demurrer, but defendant met the same by proof practically conclusive that at the time of the death of Dunlap the wire held in his hand was charged with a current of about 110 volts, such as is generally used in domestic purposes for electric lighting. The defendant followed this evidence up with the testimony of four expert witnesses, some of whom, it appears, have had a large and extensive experience in the electrical business, each of whom testified that a secondary wire charged with a voltage of approximately 110 volts was harmless under all conditions, and 500 was the lowest voltage either of said witnesses stated was dangerous to life. There was no attempt made upon the part of the plaintiff to meet or discredit this testimony. It stands in the record uncontradicted, and is not the kind of testimony that can be ignored or dismissed as unreasonable and not worthy of credit. It devolved upon the plaintiff to meet it, and, failing to do so, we are of the opinion the case failed with it.

It is true the plaintiff and two others testified that they observed a small blister burn on the back of the left hand of the deceased, but the proof of this fact alone does

not carry much weight. There was no autopsy held over the body of the deceased, although the three undertakers testified that they examined the body for burns and found none.

The question may be asked: If the death was not caused by an electric shock, then what did cause it? In answer to that it may be said that it does not devolve upon the defendant to make an acceptable explanation. However, defendant did produce the testimony of witnesses to the effect that Harry Dunlap had been complaining of being sick and in bad physical condition for a week before his death, and one witness testified that Mrs. Dunlap told him the same evening after the death of her husband that he felt bad the day of his death, that he did not eat much dinner, and that he had a weak heart. The foregoing testimony was either denied or met with such counter evidence as to make it a question for the jury.

For the reasons given, we recommend that the judgment be reversed and remanded for a new trial.

By the Court: It is so ordered.