## HEPNER v. QUAPAW GAS CO.

No. 11244—Opinion Filed July 24, 1923.

1. **Negligence—Insufficiency of Evidence—Direction of Verdict.**

In this jurisdiction a motion for a directed verdict in negligence cases is not favored, but where the evidence for plaintiff is such, after considering all the inferences and conclusions to be reasonably drawn therefrom, that an essential element of liability is wholly lacking, and where a verdict for plaintiff in any amount must necessarily be based on speculation and conjecture as to the essential element of liability not shown by the evidence, it is proper to sustain a motion for a directed verdict for defendant.

**2. Negligence—Proximate Cause—Province of Court and Jury.**

As a general rule the proximate cause of an injury in negligence cases is a question of fact for determination by the jury, but this general rule has its exception. Where all of the evidence favorable to plaintiff, together with all inferences and conclusions to be reasonably drawn therefrom, is insufficient to point out clearly a causal connection between the alleged negligence of defendant and plaintiff's injury, and where no element of willful or intentional wrong is present, it becomes a matter of law for determination by the court whether a verdict necessarily finding the alleged negligence to be the proximate cause of the injury finds sufficient support in the evidence, because it is an established rule in this state that a verdict based on speculation and conjecture will not be permitted to stand.

**3. Evidence—Insufficiency—Conjecture.**

A verdict must be said to be based on speculation and conjecture when, after considering all the evidence favorable to plaintiff, together with all inferences to be reasonably drawn therefrom, and excluding all evidence favorable to defendant, all unprejudiced minds must agree, from the facts and circumstances in evidence, that any one of several conclusions consistent with nonliability of defendant may as reasonably be drawn therefrom as is the conclusion of liability under plaintiff's theory of the case.

(Syllabus by Logsdon, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Washington County; Preston A. Shinn, Judge.

Action by Phoebe M. Hepner against the Quapaw Gas Company for damages alleged to have resulted from the negligent operation of a gas pipe line. Motion to direct a verdict for defendant sustained, and judgment entered in conformity with such verdict, to reverse which this proceeding was commenced by petition in error with case-made attached. Affirmed.

This action was commenced in the district court of Washington county, Okla., by the plaintiff in error against the defendant in error for damages in the sum of $10,000 for personal injury alleged to have been suffered by her as a result of the negligence of the defendant in the operation of a gas pipe line. In substance her petition alleged that she resided about two miles east of the town of Copan, Okla., the house in which she lived being supplied with gas for fuel purposes from the pipe line of defendant which extended near her home and into the town of Copan; that the contract for this fuel supply was entered into about March 1, 1916, with the Field Gas Company, which supplied same from defendant's pipe line; that the pipes and fixtures in the home of plaintiff belonged to the premises and were not under the control of the defendant, but that same were connected to defendant's pipe line a short distance from the home of the plaintiff; that during the month of February, 1917, defendant connected an additional well to its gas pipe line, which said well contained salt water; that prior to connecting said last mentioned well the supply of gas through defendant's pipe line supplied to plaintiff was excellent fuel gas; that after said well was connected salt water accumulated in the pipes in plaintiff's residence, corroding the fixtures and leaking through the jets and burners in said house; that she notified defendant of such condition and that defendant thereafter installed what is described as a trap or drip in the line between plaintiff's residence and said salt water well, but that said trap or drip was inadequate to relieve the condition caused by said salt water mixed with said gas coming from said well; that frequent complaint was made to the defendant of said conditions, but that nothing further was done to remedy the trouble thus created; that said salt water so negligently permitted by the defendant to enter the pipes upon premises of the plaintiff during the six weeks preceding July 20, 1917, so deteriorated and weakened said pipes that they would not withstand the pressure of the gas therein and that by reason thereof leaks and openings were caused in said pipes between the ceiling and the roof of plaintiff's dwelling so that great quantities of gas escaped from said pipes and accumulated between the ceiling and roof of said house, and that on July 20, 1917, when the gas jets in the dining room of plaintiff's residence were lighted they ignited the gas so accumulated between the ceiling and the roof and caused an explosion, resulting in burning and seriously injuring the plaintiff about her head, face, arms, and body, and inflicting upon her great scars and permanently impairing her nervous system, to her damage in the said sum of $10,000. For its answer the defendant denied generally and specifically the allegation of plaintiff's petition and as a special answer and defense alleged contributory negligence on the part of the plaintiff and of her husband. At the close of all the testimony defendant interposed a motion for a directed verdict which was by the court sustained, and judgment rendered in favor of the defendant.

O. L. Rider and H. H. Montgomery, for plaintiff in error.

Robert D. Garver, C. C. Julien, and Warren T. Spies, for defendant in error.

Opinion by LOGSDON, C. There are four assignments of error in the petition in error, but plaintiff presents and argues in her brief only the fourth assignment, which is "that the court erred in directing a verdict in favor of the defendant;" and since this involves a consideration of the entire record of the trial, the other assignments of error will be considered as waived.

Plaintiff's testimony conformed to the allegations of her petition, and the question for determination is whether, admitting the truth of all the evidence in favor of plaintiff, together with all inference and conclusions to be reasonably drawn therefrom, there is sufficient competent evidence to sustain a verdict in her favor, if one had been returned. This will necessitate quotations from the record where the testimony touches vital issues of fact in their relation to legal questions involved. The rule is established that actionable negligence, in the absence of intentional and willful wrong, must embrace three essential elements, viz.: (1) The existence of a duty on the part of the defendant to protect the plaintiff from injury; (2) failure of the defendant to perform that duty; (3) injury to the plaintiff resulting proximately from such failure.

Obviously the first inquiry is, What duty, if any, did defendant owe to plaintiff to protect her from injury? There was no contractual relation between the parties. Therefore, the duty which defendant owed to the plaintiff was no greater and no less than the duty which it owed to the public at large. This duty was to manage and control its pipe line with ordinary care. What amounts legally to ordinary care varies with the degree of danger inherent in the agency or instrumentality used, and with the manner of its use. That which would amount to ordinary care under the facts of one case might, conceivably, under the facts of another case constitute gross carelessness.

Defendant, then, owed to plaintiff the duty to use ordinary care in the operation of its pipe line to protect her from injury. In what respect did defendant fail to perform that duty, if it did so fail? This necessitates a recapitulation of portions of the testimony as introduced by the plaintiff, and a literal transcribing of other portions material and relevant to the inquiry.

The recapitulation will be copied from plaintiff's brief. Plaintiff testified:

That she and her family were living about two miles east of Copan in a house owned by J. C. Sheets, which house was destroyed by fire on July 20, 1917. In said fire plaintiff was seriously burned, thereby receiving the injuries complained of. This house was piped for gas for domestic purposes, said gas being furnished by Field Gas Company to whom payment therefor was made. The Field Gas Company also supplied gas to residents of the town of Copan. Defendant, Quapaw Gas Company, owned and operated a pipe line for the transportation of gas and furnished gas to Field Gas Company for distribution to the customers of the latter company. This pipe line ran in front of said house occupied by plaintiff and at a distance therefrom of approximately forty feet. The pipe and fixtures in said house were installed at the time said house was built, about four and a half years before the fire. Said pipe and fixtures, when installed, were new. They were tested at a test of 150 pounds and there were no leaks. Subsequently, on or about April 10, 1917, the lines in the house were again tested for leaks by Mr. O. M. Huffman, because plaintiff thought their gas bill too high, and he said they were in good condition. Gas for use in said house was supplied by a connection with said pipe line of the defendant in error. Sometime prior to the fire a high pressure gas well was drilled in, approximately one mile south of said house. This well also produced in great quantities a substance commonly called "salt water". In February, 1917, approximately five months before said fire, this well, which is generally referred to in the evidence as the salt water well, was connected with said pipe line of defendant at a point about one hundred feet from said house. Prior to such connection plaintiff had no trouble with her lines or fixtures, or the supply of gas.

Quoting now literally from plaintiff's testimony, at page 47 of the case-made:

"Q. Had you had any trouble with your gas and the supply of gas prior to the date of this fire? A. Had we had any trouble? Q. Yes. A. Yes. Q. For about how long? A. Well, I can't just exactly tell; possibly two months, or six weeks. Q. Prior to that time, to these two months or six weeks, that you refer to, had you had any trouble with the gas? A. No, sir, we hadn't. Q. What was the nature of the trouble that you commenced having with the gas about six weeks or two months before the fire? A. Our first experience was our lines were filled with some sort of fluid that just had a bad odor to it, and when I went to light the stoves or lights this fluid come out of the spigot where I would turn to light

them. Q. And prevent you from lighting them? A. At times it couldn't be lighted at all. (On cross-examination): Q. Had you ever had any trouble before this,—that is, you have had no gas leaks prior to this explosion? A. I don't understand you. Q. Have you ever been troubled with gas leaks before the explosion? A. We had had this trouble, of course, as I told you. Q. That was salt water leaking through an open jet? A. Yes, sir. Q. You say—I don't understand just the occurrence of the fire that evening,—was the salt water spurting that evening before the accident? A. As I told you, the meter was full of water. Q. Yes, ma'm. A. When that meter was full of water we had no pressure whatever in the lines; I left it alone at those times. Q. And before the explosion your husband emptied the meter that evening? A. He did."

J. D. McCoid testified:

"I live at Copan, Okla.; am in the banking business and have been, since October, 1910. I was living in Copan at the time the Sheets house was occupied by the Hepners. At that time I was cashier of the bank and collector for the Field Gas Company and also "drip turner" for the Quapaw. I was employed by both companies. I am acquainted with where the main line of the Quapaw runs near Copan. It comes from the east over near Wann along the public highway to the regulator at the north central part of Copan, to the Field Gas Company's regulator. The Sheets house occupied by the Hepners was just about two miles due east of this regulator. The main line of the Quapaw ran in the neighborhood of forty or fifty feet from the Sheets house as then constructed and came on past their home to this regulator. I received complaints from Mrs. Hepner regarding the salt water in her pipes. I first received complaint. I should judge, along about the latter part of May or the first of June,—may be about the middle of June, along there sometime. I reported these complaints to the Quapaw after first reporting them to the Field Gas Company, who authorized me to report to the Quapaw, who they said that work belonged to. I reported to the pipe line department of the Quapaw at Bartlesville, Okla. I reported to them the salt water condition of this line. The first report I made to them I told them in regard to the salt water being in this line and ruining the furniture and cook stove of Hepner's, and it was making a dangerous condition, and they ought to fix it. They notified me that they would go ahead and fix it at once. After they had put in the drip that Mrs. Hepner spoke about a while ago, it was called to my attention on numerous times by Mr. and Mrs. Hepner, and I invariably reported by telephone on each occasion. Just the number of times I don't know. Some little time after I had reported to them the first time, they did something to prevent the getting in of that salt water. They put in a drip out there on the main line, between the salt water well and their main line. They put in this drip by Hepner's first and this salt water got so bad that it flowed on this two miles to Copan and into the city lines, through the regulator that belonged to the Field Gas Company, and I continually reported this and had to get a man to come out from Dewey to drain some of the city lines. As a result of these complaints and the presence of the salt water, they then put in another drip. That drip was put in on the main line somewhere in the neighborhood of a hundred to a hundred and fifty feet east of this regulator, which would be nearly two miles from the Hepner house and after the line passed the Hepner house. After they put in that drip there by the regulator, I had no more trouble in town with salt water, that is, in a few days after that, after they had a chance to drain all the lines and get the salt water out. That drip was large enough to take care of all the salt water at that point, and absolutely took care of all of it. That drip would not in any way whatever affect the line at the point where the Hepners took out their gas, and would in no way whatever relieve the lines from salt water at that point. After the fire I took the meter that was located at the Hepners to the bank. I don't know where it is now, or how it got out of the bank. I examined the condition of that meter. It was in a condition of rust. That meter is made of iron. I don't know what is on the inside of it. The casing of the meter, the part that you can see, is iron. I examined the condition of that part of the meter. It was rusty. I noticed the condition of some of the pipe, and also the inside,—the connections of the meter. These inside connections are made of iron. The pipe is made of iron. The pipe at the time that I saw it was after the fire, and it was, of course, burned on the outside from the fire, and from an examination of the inside, it had scales in there. It was rust scales caused from something deteriorating the inside of the pipe, causing it to rust, causing scales to form inside of it. The examination was made the next day, either the first or second day after the fire, I don't recollect which. It was a part of the pipe that was in the ruins of the house. The stop or jet cocks, or the valves where the gas comes out, these were all tight so that it was impossible to turn them. The meter had a connection on it where the nipple screws in, and then a union connects that nipple and comes around and inside of this hole in the meter where the nipple connects. It was all rusty in there, and by putting my finger in there I could get the scales of rust from that as far in as I could reach with my finger."

J. C. Sheets testified:

"I live in Copan; my business is producing oil, running tools, doing a little farming; I have been in the oil business twenty-five years. I owned the house that the Hepners lived in which burned as a result of the explosion. I believe I am acquainted with the location of the Quapaw pipe line as it comes into Copan. It goes about forty feet from this house that was burned. The well that the salt water comes from into the Quapaw pipe is one mile south. One of our drillers drilled the well and we owned the fee in the land it was drilled on at the time it was drilled, and owned it up until some four months ago. I was present when the well was drilled in. I am very much acquainted with the substance that is found in some oil and gas wells, commonly called salt water. We are handling several thousand barrels of it each month. I noticed some of that substance at this particular well at the time it was drilled in. The well was a very high pressure well, volume about two million, and just a little damp at the time it was drilled in. The connection of this well with the pipe line is west from the Hepner house, approximately one hundred feet. The drip is in the draw, approximately one thousand feet south from that connection. The surface of the ground is sloping to the draw south about a quarter of a mile. From the house to where the connection is made that feeds the gas to the Hepner house, the ground is level east and west, sloping towards the south, running towards the gas well. The house was built under contract with plumbing put in, and the contract, I believe, called for a test of 150 pounds. New pipe was put in all the way through. It was tested at the time it was put in. There were no leaks. The house was built, I believe, about four years and a half before the fire in 1917. The frame of the house was put up and the plumbing put in before the house was completed. I am actively engaged in laying and relaying of lines and the different work we are doing in producing oil. In that business I am in contact with salt water and the effect of salt water on pipes. I have had charge of property and have been actively engaged for about 25 years. I have owned production about 17 years. I never saw any place yet that salt water didn't affect iron pipe. Its effect has been under my observation and I have met and handled such situations during that time. I am in direct charge of the work we are doing. The effect of salt water on metallic pipes altogether depends on if you are just putting salt water through them or if there is a certain proportion of oil. Oil will naturally lubricate pipe, but even with oil going through it, it will finally cut that pipe out. Salt water will eat any pipe."

Quoting now literally from Sheet's testimony, at page 87 of the case-made:

"Q. Basing your answer on your knowledge of the pipe that was in this house and in this line, and your knowledge of the salt water that was in the well, and your general experience and observation in dealing with salt water, what would you say would be the effect of such salt water upon the pipes and fixtures in that house? A. Salt water will eat any pipe. Q. Well, confine it now to this house; what would be the effect upon pipes and fixtures in that house? A. Well, in time it would eat it up. Q. In time it would eat it up? A. Yes, sir; that just depends upon how strong the salt water would be and what the conditions would be. Q. That would be a gradual deterioration of the pipe, would it not, or would it be sudden? A. No, it would be a gradual deterioration of the pipe".

This is all of the plaintiff's testimony material and relevant to the present inquiry. By it the following facts are established: (1) That her service pipes were connected to defendant's supply line, but were not under its control; (2) that in April her service pipes were inspected by a man of her selection and found to be in first-class condition; (3) that in the latter part of May salt water appeared in her service pipes; (4) that this retarded the gas pressure, sometimes making it impossible to light the jets and burners; (5) that at such times salt water instead of gas spurted from the jets and burners when opened; (6) that she made complaint of the salt water, and that defendant took measures to remedy the trouble; (7) that the drip installed was inadequate; (8) that no leaks in the service pipes were ever discovered; (9) that on July 20th, when the jet was lighted, an explosion and fire occurred; (10) that plaintiff was injured thereby; (11) that after the explosion and fire the service pipes and meter were found to have rust scales in them; (12) that salt water will deteriorate metal pipe in process of time, depending on the strength of the solution and the condition of the pipe when it is introduced.

Clearly these facts fall far short of establishing a failure of the defendant to perform its duty of exercising ordinary care to protect the plaintiff from injury, unless the inferences and conclusions to be reasonably drawn from these facts add to the probative value of the facts themselves. It may be reasonably inferred from the facts in evidence: (1) That plaintiff did not consider the presence of salt water as likely to cause an escape of gas from her

service pipes, but that its presence caused low gas pressure and was ruining her stove and furniture; (2) that salt water in gas pipes is not a dangerous agency in and of itself, but may become so through the slow process of deterioration of the pipes; (3) that defendant's attention was never called to any condition resultant from the salt water which would indicate danger of gas escaping upon or about the premises of plaintiff; (4) that the lights in plaintiff's house were burned nightly up to the time of the explosion; (5) that the gas which exploded escaped suddenly in large quantities; (6) that the cause of the escape of this gas is unknown; (7) that the salt water caused a sudden deterioration and leak of sufficient size to produce the result shown, is purely conjecture.

The first paragraph of the syllabus in Midland Valley R. Co. v. Rupe, 87 Okla. 286, 210 Pac. 1038, is very apropos to the situation here presented:

"The fact that a fire which destroyed property originated from the sparks of a passing locomotive may be shown by circumstantial evidence, and oftentimes this is the only evidence obtainable in such cases; but, as such evidence consists in reasoning from facts which are known or proved to exist in order to establish such as are conjectured to exist, the process of reasoning is defective if the circumstances from which it is sought to deduce the conclusion depend also upon conjecture and speculation."

Here the conclusion that the obvious leak in the pipe was caused by the salt water in the brief space of six weeks or two months is based solely upon speculation and conjecture suggested by the presence of the salt water prior to the explosion and the presence of rust in the pipes and meter afterwards. Upon this speculation and conjectural conclusion is based the ultimate conjecture that the negligence of defendant in permitting salt water to get into the service pipes was the proximate cause of plaintiff's injury. Neither conclusion is logical nor strongly persuasive. A conclusion equally as reasonable would be that the intense heat generated and stored between the ceiling and roof by the sun's rays on this July day caused a sudden expansion of the metal sufficient to loosen or break a connection in the pipe and so cause the leak. Or the plaintiff's husband, when he disconnected the pipe from the meter that evening to drain it, may have broken or loosened a connection within the walls of the dwelling. Equally reasonable is the conclusion that through inadvertence one of the jets in one of the other rooms of the house was left open.

Plaintiff cites and relies upon a line of decisions by this and other courts to show that the degree of care owed by defendant to plaintiff was of the highest because of the inherently dangerous character of natural gas. An examination of these authorities reveals that in each case the defendant negligently permitted the dangerous element, whether gas or electricity, to escape from its mains or wires over which it had direct control, and become a menace to persons and property; or where, with knowledge or notice of leaks in service pipes, it negligently forced its gas into such leaky pipes. Ladow v. Oklahoma Gas & Electric Co., 28 Okla. 15, 119 Pac. 250; Bellevue Gas & Oil Co. v. Carr, 61 Okla. 290, 161 Pac. 203; Oklahoma Gas & Electric Co. v. Oklahoma Railway Co., 77 Okla. 290, 188 Pac. 331; Southern Indiana Gas Co. v. Tyner (Ind. App.) 97 N. E. 580. None of these elements of negligence are present in the instant case. The only negligence here shown is the installing of an inadequate drip or trap to catch the salt water, the presence of which in the pipes was neither inherently nor imminently dangerous. It is therefore concluded that this negligence was not the proximate cause of plaintiff's injury.

But plaintiff contends that proximate cause is always a jury question, and that the court committed error in taking this question from the jury. As a general rule plaintiff's contention is correct. But this rule, like most rules announcing general principles, has its well-defined exception. In 28 Corpus Juris, p. 603, the exception is thus stated:

"Proximate cause ordinarily is a question for the jury, to be determined as a fact from the particular situation, in view of the facts and circumstances surrounding it. But if the evidence in this respect is so inconclusive that no well constituted mind can reasonably draw therefrom the inference that defendant's negligence was the proximate cause of plaintiff's injury, it becomes the duty of the court, when requested, to instruct the jury that the evidence is insufficient."

In Wichita Falls & N. W. Ry. Co. v. Cover, 65 Okla. 110, 164 Pac. 660, the second paragraph of the syllabus reads:

"Ordinarily the question of approximate cause is one of fact for the jury, but where the facts are not in dispute and reasonable men cannot differ on the question, it may become one of law for the court."

Justice Kane, in Northrup v. Eakes, 72 Oklahoma, 178 Pac. 266, sp. cit. 268, in discussing proximate cause, said:

"Whilst it is true that there is no infallible rule by which one can distinguish between the proximate and remote cause, still the rules of law are reasonably well settled, however difficult they may be of application to the varied affairs of life It is generally held that in order to warrant a finding that negligence, or an act not amounting to wanton injury, is the proximate cause of the injury, it must appear that the injury was the natural and probable result of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attendant circumstances. M. & St. P. Ry. Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256."

In this jurisdiction a motion for a directed verdict is not favored in negligence cases, but where the evidence is such that a verdict for plaintiff in any amount must necessarily be based upon speculation and conjecture, it is proper to direct a verdict for defendant. Kansas City Southern Ry Co. v. Langley, 62 Okla. 49, 160 Pac. 451; Ingram et al. v. Dunning, 60 Okla. 233, 159 Pac. 927; Kansas City Southern Ry. Co. v. Henderson, 54 Okla. 320, 153 Pac. 872; St. Louis & S. F. Ry. Co. v. Mobley, 70 Oklahoma, 174 Pac. 510; Midland Valley R. Co. v. Rupe, supra.

The judgment of the trial court should, therefore, be affirmed.

By the Court: It is so ordered.