## TURMAN OIL CO. v. CARMAN.

No. 26856. Dec. 15, 1936.

Rehearing Denied March 16, 1937.

C. B. McCrory, C. E. Cooper, and J. H. Parsons, for plaintiff in error.

Cheatham & Smith, for defendant in error.

PER CURIAM. The parties will be referred to as they appeared in the trial court. Plaintiff sued the Turman Oil Company, Mid-Continent Petroleum Corporation, Harry Robbins, and Joe Feinburg and the Sheft's Supply Company for damages resulting from the pollution of a stream with oil and salt water, which it is claimed resulted in a deposit of oil and salt water on the premises of the plaintiff by reason of which 28 pecan trees died. Certain other elements of damage are alleged. A judgment was entered for the plaintiff for $1,000 against the Turman Oil Company and Sheft's Supply Company. The Sheft's Supply Company did not appeal. The Turman Oil Company prosecuted its appeal from such judgment in due course by petition in error with case-made attached.

The defendant urges that there is no competent evidence that the damage occurred within two years immediately preceding the filing of the petition, and further that there is no competent evidence that the Turman Oil Company permitted oil and salt water to escape into the creek, and further that there is no competent evidence sustaining the proposition that the injury to the land of the plaintiff resulted from the alleged negligent act, even if the Turman Oil Company is shown to have permitted the oil and salt water to escape into the creek.

It therefore becomes necessary to review the evidence. Plaintiff testified that he had been the owner of the premises for 12 or 14 years; that the Turman Oil Company lease was some distance up the creek that ran by the premises; that the Mid-Continent Petroleum Corporation, in 1930 and 1931, operated a lease between the Turman Oil Company lease and his place; that when it rains hard the water spreads all over his farm, and that he has a pecan grove, and that five acres of this pecan grove died by reason of the flood occurring in 1931 and 1932; and after a flood in January, 1932, he went down to look at the premises and found the land all flooded in the area of the pecan trees; that this was in the spring of 1932, and that it left a lot of water standing in this area, which is a little bit lower than the rest of the farm; that this water was salt water; that he never noticed any salt water until in January, 1932; that he could not describe the quantity of it, but it was all over the small place, and that the salt could be seen, and that he tasted the water and it was real salty.

The question of the damages to the trees is amply proved.

Plaintiff further testified that he and witness Delano went to the premises of Turman Oil Company in April, 1932, for the first time. He testified as to the watershed of the Turman Oil Company lease; that the water comes off of the watershed into Deep Fork creek and strikes plaintiff's land; that there were ten or twelve wells on the Turman lease, and that there is a pond there

in which they impounded the salt water, which is about 400 or 500 feet long and 200 feet wide, and that it is right in the draw; that the first time he was there was in 1932, in the month of April, and that it is about half a mile from where the creek comes into the premises of the plaintiff up to the Turman Oil lease; that he did not observe the water coming down; that it hit his land; that he first made the investigation as to the damages resulting alleged in his petition, in the spring of 1932, with Mr. Gillespie and Mr. Delano; that he and Mr. Gillespie went out there on more than one occasion; that they went up this branch and walked up the hill and found the Mid-Continent lease and found salt water in big tanks and big chunks of salt around the wells where the water had evaporated, and that the vegetation around the wells had been killed and that the water which fell upon this area washed down into the branch, and that they could see where it went, and that the oil and salt water were draining down the draw into the creek; that he tasted the water and never tasted as salty water in his life; that they then came to the Turman lease and found the ten or twelve wells referred to above and found a big lake where the lake had broken loose; that water had come through and broken the dam: that there was not any lake there, but it was where the lake had been, but that it had broken through; that they went up there (indicating) and came to the edge of the Wilcox lease and got on their land and saw their men and told them about the salt water damaging their land, and that they showed where it did not do that, and that they were taking care of their water on the other side; that the Wilcox lease had four wells; that this watershed took in part of the Wilcox lease and all of the Turman lease; that there is 200 feet in area around the pond of the Turman lease where there is no vegetation, but that it did not show salt water then (at the time of the testimony of plaintiff). He then testified as to his knowledge about the Turman Oil Company producing salt water as follows:

"Q. Do you know about these wells producing salt water? A. Yes, sir. Q. What did you do to show that? A. I got some salt water there day before yesterday. By Mr. McCrory: We object to the answer and move it be stricken as it is incompetent, irrelevant and immaterial, and does not relate to the time complained of. By the Court: Sustained. Q. I am talking about 1931 and 1932? A. I am talking about 1932. Q. When you found the salt water? A. Yes. Q. Did you notice any crystals on the ground? A. It was white around there. Q. On the Turman lease? A. Yes, sir. Q. What about oil? A. There is lots of oil around there. Q. Was there such a quantity of oil and salt water around there that the vegetation had been killed? A. Yes, it is today. I would like to have the jury see it today."

Plaintiff then continues to testify that he saw just one pond and testified from a map which he states that he made at about that time; and he showed by demonstration about the location of wells draining into this creek and into the pond and demonstrated that the pond had broken loose; that plaintiff and Mr. Gillespie went to the place again in the fall of the year 1932, and found salt in the pond and no dam there, and that the stream was running then and this salt water was running down this stream.

Witness Delano testified as to this state of the Turman lease as follows: That he went with plaintiff Carman in the fall of 1932, and found a lake that had an opening allowing the water to get out, and that the wells had been emptied into the lake, but the dike had an opening in it which came out into the branch; that there was quite a bit of oil on the land above the lake and evidence of salt water; that they saw a good many trees that were dead and tasted the water to see if it was salty.

U. G. Gillespie testified that he went with the plaintiff in the fall of 1932 for the specific purpose of seeing how many trees were dead on the land of the plaintiff; that it was the only time he had been there except once before to hunt; that he also went down to see where the damages came from and went out to the pecan grove and counted 28 dead trees; that he and the plaintiff went to a well on the south side of the highway and where salt water came down from the wells, and on the north side of the road where there were trees, they found salt crystals; that this was immediately north of the highway from the place to Beggs; that they found ten or twelve wells on this lease and that salt water and oil was coming from the wells and was going into tanks and coming from them and was all over the ground; that it was the Turman lease on which they found the pond that was broken and that there was oil all over the ground around the pond and that the trees were dead in it, but that there was not any water in it that he recalls, and he thinks it was dry; that this pond was broken and the place where the break was had allowed the water to escape and shot the water all over the surface of the ground three or

four hundred feet, and that oil ran from the lease down to the branch and that they tasted the water and it was salty.

It will be seen, therefore, that there is confusion in the testimony of the witness Delano and the plaintiff as to whether Delano was with the plaintiff in the spring of 1932, and upon this point Delano testified that he went to the premises in the fall of 1932.

It is urged that to find from the evidence that the damage resulted from the overflow or refuse oil and salt water from the defendant's lease is to place an inference upon an inference, and that this cannot be done according to the rule announced in many authorities of this court, including Prest-O-Lite Co. v. Howery, 169 Okla. 408, 37 P. (2d) 303; Midland Valley Railway Co. v. Rupe, 87 Okla. 286, 210 P. 1038; St. Louis & S. F. Ry. Co. v. Model Laundry, 42 Okla. 501, 141 P. 970.

In the recent case of Highway Const. Co. v. Shue, 173 Okla. 456, 49 P. (2d) 203, this court had occasion to discuss the very question at point. That was a case in which a truck driver was found dead and the action was based on the theory that his truck had overturned due to the faulty construction of the roadbed over which he was forced to drive. Because we therein state the principle upon which such evidence is worthy of belief, we quote at length from said opinion:

"The defendant does not seriously urge that the evidence was insufficient to sustain a finding of negligence based on the condition of the roadway. The defendant does contend that the plaintiff failed to show a causal connection between the negligence and the injury, that is, that the rough road caused the death. Defendant argues that it can just as reasonably be said that the truck left the road because Shue was driving at an excessive speed or was not paying attention to the road, or was searching his clothes for a match, lighting a cigarette, waving to a friend, unlacing his shoe, or had fallen asleep or was suddenly seized with illness, and that Hepner v. Quapaw Gas. Co., 92 Okla. 9, 217 P. 438, is applicable, to the effect that: 'A verdict must be said to be based on speculation and conjecture when, after considering all the evidence favorable to plaintiff, together with all inferences to be reasonably drawn therefrom, and excluding all evidence favorable to defendant, all unprejudiced minds must agree, from the facts and circumstances in evidence, that any one of several conclusions consistent with nonliability of defendant may as reasonably be drawn therefrom as is the conclusion of liability under plaintiff's theory of the case.'

"A close analysis of the foregoing definition reveals that an important line of demarcation exists between that case and the group of cases exemplified by Weleetka Cotton Oil Co. v. Brookshire, 65 Okla. 293, 166 P. 408, wherein the principle is announced that in a civil case, all that the plaintiff is required to do in order to establish his case is to make it appear more probable that the injury came in whole or in part from the defendant's negligence than from any other cause, and this fact may be established by circumstantial evidence. The two rules are consistent. Considering them together, we have this: If any one of several other conclusions is as consistent with the facts as is the conclusion that the negligence caused the injury, then the verdict may be said to be based upon conjecture. But if those other conclusions (i. e., that the negligence did not cause the injury but that something else did) are not as consistent with the facts as is the conclusion that the negligence caused the injury, it cannot then be said that the verdict is based upon conjecture. It is a matter of equality or inequality of probabilities, and we mean real, logical probabilities, based upon established facts, as opposed to speculation and guesswork. We must exclude all those tempting, so-called probabilities which are the result of heaping inference upon inference. While one reasonable inference resulting from a proven fact or facts may be treated as evidence in itself, it cannot be utilized as a basic proven fact for the generation of further, additional inferences. Good reason lies behind that rule, for the purpose of all evidence is to discover the truth; facts do discover it, while a maze of dependent inferences only conceal it."

The case of Prest-O-Lite Co. v. Howery, supra, relied upon by the defendant is therein cited. That was an action for damages to live stock by reason of an alleged pollution of a stream by a manufacturing concern, and it was the claim that chickens and livestock drank the water and died. The judgment for the plaintiff was reversed. Commenting on this case in Highway Const. Co. v. Shue, supra, we said:

"Plaintiff's whole case was built on interdependent inferences in this manner: (a) The chickens drank the water and died, therefore, it was poisonous. (b) The water was poisonous, therefore, it was the drinking of the water which killed them, and not some other cause."

In the syllabus of Prest-O-Lite Co. v. Howery, supra, we said:

"In order to sustain a recovery in an action based on negligence, there must be a causal connection between the negligence

averred and the injury received, and such causal connection cannot be established by basing inference upon inference, or presumption upon presumption."

Other than the statement in the quoted testimony above there is no evidence of any witness of the plaintiff that they saw the Turman lease before April, 1932. The last flood upon which damage was based was in January, 1932. If we exclude an isolated statement by the witness Brewer, of which complaint is made, there is no testimony in the record that any one who testified in this case was familiar with the conditions of the lease prior to April, 1932. That statement was made in rebuttal by the witness Brewer, and he was asked if he knew the conditions of the Turman lease in 1931-1932. He stated that he was in Okmulgee in 1931, and was in Creek county in 1932. An objection that this testimony was in chief and not proper rebuttal was overruled, but we think this testimony insufficient to show that the witness was ever on the Turman lease prior to 1932, for he states that he was in Okmulgee in 1931, and the purport of his testimony was that in 1931 and 1932 the Turman lease had dead vegetation around it.

The testimony of the plaintiff is that his land overflowed in the fall of 1931, and January, 1932. There must be competent evidence that salt water was escaping from the Turman lease in the fall of 1931, or January, 1932. The sole question therefore is, Does the record contain such evidence? If we exclude the testimony of Brewer as above stated, that there was dead vegetation around it in 1931 and 1932, and limit it to the facts relative to which he testified, which is a proper construction of his testimony, it would be no more than a statement formerly made by the other witnesses that there was dead vegetation around the Turman lease in 1932. No other witness testified for the plaintiff that he saw the lease in 1931. Plaintiff does not testify that he saw the lease in 1931. In fact, he testified that he did not see the lease in 1931; and that he saw it first in April, 1932, at which time salt water was being produced on the premises. Three witnesses testified, only one of which, by any stretch of the testimony, can be construed as having seen the lease as early as April, 1932. They testified as aforesaid that there was an open tank with a path leading to the branch that flowed to the lake that ran by the plaintiff's place. In our opinion, this is not competent evidence that salt water overflowed on the plaintiff's land from the Turman lease in the fall of 1931, or January of 1932.

The damage herein is proved. By reason of lack of evidence as to the causal connection between the injurious acts and the damage, the cause is reversed for a new trial.

McNEILL, C. J., OSBORN, V. C. J., and BAYLESS, PHELPS, and CORN, JJ., concur.