Note.—See under (1) 39 C. J. p. 1303, §1501; 28 Cyc. p. 39; anno. 41 L. R. A. (N. S.) 775; 50 L. R. A. (N. S.) 59; L. R. A. 1916F, 223; L. R. A. 1917F. 365; L. R. A. 1918F, 207; 2 R. C. L. p. 1200; 1 R. C. L. Supp. 734, et seq. 4 R. C. L. Supp. p. 153; 5 R. C. L. Supp. p. 140. (2) 39 C. J. p. 1363, §1593; 28 Cyc. pp. 46, 48.

---

**CRABB, Adm'x, v. OKLAHOMA GAS & ELECTRIC CO.**

No. 17063—Opinion Filed Nov. 16, 1926.

**1. Master and Servant—Liability for Injuries to Servant from Unsafe Working Place.**

The master is liable for injuries to his servant which result from a failure of the master to furnish a reasonably safe place for the servant to perform his work.

**2. Same—Questions of Fact as to Liability —Erroneous Direction of Verdict.**

It is error for the court to instruct the jury to return a verdict for the defendant in a personal injury case. where the evidence is of such a nature that men of ordinary intelligence may arrive at different conclusions on the issue of fact relating to the responsibility of the defendant for the injury.

**3. Same—Statutory Safeguard for Laborers on Building—Temporary Flooring.**

The contractor or builder is not required under the provisions of section 7270, C. O. S. 1921, to lay a temporary flooring in the course of the construction of a building, where the plans for the building do not require the laying of a permanent floor.

**4. Jury—Stockholder in Defendant Corporation Disqualified.**

A stockholder of a corporation, which is the defendant in a personal injury action, is not qualified to sit as a juror in the trial of the action.

**5. Master and Servant—Rights and Liabilities in Selection of Hospital for Injured Employee.**

The master may exercise his own judgment in the selection of a hospital for treatment of an injured employee, and he will not be liable for damages on account of the choice, if he exercises reasonable care to select a hospital suited and equipped to treat the injury suffered by the employee. If the next of kin be on the ground, and desire to take charge of the injured employe, or they have some proper person on the ground immediately ready to take charge of him, the right should be accorded them, but the master will not be liable for any improper treatment or delay in rendering service to the injured employee.

**6. Same—Action for Injuries to Servant— Instructed Verdict for Defendant not Sustained.**

Record examined; held to be insufficient to support an instructed verdict against the plaintiff.

(Syllabus by Stephenson, C.)

Commissioners' Opinion, Division No. 4.

Error from District Court, Oklahoma County; Wm. H. Zwick, Judge.

Action by Mary J. Crabb, administratrix of the estate of J. B. Crabb, deceased, against the Oklahoma Gas & Electric Company for the alleged wrongful death of her husband. Judgment on an instructed verdict for the defendant. The plaintiff brings error. Reversed and remanded.

E. C. Stanard and M. L. Hankins. for plaintiff in error.

Ross & Thurman, for defendant in error.

Opinion by STEPHENSON, C. Mary J. Crabb, as administratrix of the estate of

J. B. Crabb, deceased, commenced her action against the Oklahoma Gas & Electric Company for the alleged wrongful death of her husband while in the employ of the defendant. The trial of the cause resulted in an instructed verdict for the defendant. The plaintiff has perfected her appeal to this court, and assigns several of the rulings of the trial court as error for reversal.

Mr. J. B. Crabb, who lived at Shawnee, Okla., entered the service of the Gas and Electric Company as a carpenter about the first of January, 1924. He was engaged in the service of the defendant with numerous other employees in the construction of a power plant near the town of Harrah. On the date of the accident, G. J. Jones, the general superintendent of the defendant, in charge of the construction work, ordered J. B. Crabb and J. W. Stocton to chink the openings in concrete forms for beams, from which recently poured concrete was running. The concrete beams were being constructed for the support of floors on which to place turbines and other heavy machinery for the operation of the plant. The floors for the support of the machinery were constructed one above the other, but not across the entire width of the building. The distance from the ground floor, or basement, to the first floor was about 16 feet; the distance from the first floor to the second floor, from which the beam in question extended, was about 8 feet. The form for the concrete beam was built out across the open space over the basement; braces were footed on steel "I beams" extending across the open space; the upper end of the braces supported the concrete form for the beam in question. The perpendicular distance from the upper end of the brace to a point on a level with the foot of the brace on the "I beam" was about 8 feet. The foot of the timber brace was notched and fitted over the "I beam" for its support at the base. That part of the scaffold along the form where the leak developed which the employee was chinking at the time of the accident had been removed. Stocton and Crabb were standing on the first floor above the basement floor, near where the concrete was running from 3 or 4 openings in the form for the concrete beams, when superintendent Jones approached them and instructed the two men to go up on the form and stop the leaks. It was the purpose of the men to chink the openings with cotton waste, or pieces of sacking. In relation to what Superintendent Jones said, Stocton testified as follows:

"Q. He did not tell you how to do it?

A. No, sir. Just said to get up there and fix them. Q. He did not tell you to go up on this brace, did he? A. No, sir."

Witness Stocton testified that one of the openings from which concrete was running could not be reached except by climbing on one of the braces supporting the form. Superintendent Jones testified as follows in relation to the instruction to Stocton and Crabb about chinking the openings in the forms:

"Q. How did you intend for them to get up there to fix those leaks? A. I did not tell them how. I did not go into details. I told them to get up there and fix those leaks, and I passed on."

It is the contention of the defendant that scaffolding had been placed below the form for its construction, which had been removed at the time the parties were directed to chink the openings. It is said by the defendant that Stocton and Crabb should have replaced the scaffolding for use in stopping the leaks. As to the distance from the scaffolding to the form referred to, Superintendent Jones testified as follows:

"Q. And would it have been sufficient'y high for them to reach up and stop those leaks? A. Considering this scaffolding laid on an elevation of 84, the main floor level was on 91, which would make it about 7 feet from this entrance to this main turbine room floor. About 7 feet. * * * I believe a man could reach them. * * *"

While the testimony of Superintendent Jones indicates the distance from the platform to the concrete form to be about 7 feet, other parts of the record show that the distance at this particular point, on account of the varying depths of the floor, may have been about 8 feet.

Crabb climbed on one of the braces to which we have referred, to each one of the openings, for the purpose of stopping the flow of concrete therefrom, and while engaged in chinking the openings the notched footing of the brace resting on the "I beam" split off, and dropped the employee with the brace, down through the opening, a distance of about 25 feet, to the basement floor. The pine timber brace was 4"x4", and 16 feet long. The timber was cross-grained, and the shoulder of about one inch thickness split off and ran out about 16 inches from the notch, which rested on the "I beam." The accident occurred on the 24th day of May, 1924; the injured employee was removed to St. Anthony's Hospital, where he died from the injuries on June 10th.

The defendant in error makes the conten-

tion on appeal that the men were instructed not to climb on braces in their work about the concrete forms. In relation to the instructions, and such practice of the employees, Superintendent Jones testified as follows:

"Q. Did you ever see any men on any of the braces around there? A. Yes, I have seen men on other braces. Q. What would you do—say to them when you found them there? A. If it was a brace high like that, I would not say anything to him; they were considered safe; this lower end on the ground and that end high made it safe. I would not say anything particularly to them about that, but we always nail them extra heavy in case they did have to climb on them."

The testimony disclosed that there were a number of ladders used by the workmen in and about the construction of the building, but none were of a greater length than 16 feet. It would have required a ladder to be of the length of about 25 feet to reach from the basement floor to the concrete form. It is the contention of the defendant that the decedent should have taken two 16-foot ladders and nailed them together for use in reaching the concrete form in question. It is the further contention of the defendant in error that the manner and means for chinking the openings in the form were left to the choice and selection of the employees who were directed to perform the work. The witness testified that it would have required about 30 minutes to nail two 16-foot ladders together for the purpose of climbing from the basement floor to the concrete form. The superintendent testified that the concrete mixture which had been poured into the form was made thin on account of the necessity for the same to run into some small crevices in the form. Witness Stocton, who went up on the form with the decedent to chink the openings, testified that the decedent could not have reached the openings on which he was working at the time the brace broke, except by climbing on the brace for support. The witness testified that he was in an arm's length of the decedent at the time the brace broke and that Crabb was chinking an opening in the form above where the upper end of the brace was nailed to the form.

It is the duty of the master to furnish the servant a reasonably safe place in which to perform his services. The duty of the master to furnish a reasonably safe place for the servant to work is in conjunction with the obligation of the latter, at the same time, to use that degree of care for his own

safety that a reasonably prudent man would exercise in like circumstances. For those injuries from which the servant suffers damage, while in the service of the master, which are the result of the failure of the servant to use reasonable care for his own safety, the master is not liable, if the latter used reasonable care to provide a safe place for the servant to work. There are tasks which the master may direct the servant to perform which, by reason of their very nature, it is implied that the servant will resort to his own devices in preparing for, and in doing the work. It may involve the choice of the servant in the way, means, and manner in which he will do the work; it may include the duty of the servant to prepare the place for doing the work. Whether the direction of the servant by the master to perform the task includes implied obligation of the servant to make the place safe beforehand in which to do the work, or whether it is the duty of the master to prepare the place for the servant to work, are questions of fact for the jury according to the particular circumstances of the case. Whether it was the duty of the master, or that of the servant, to make the place reasonably safe in which to do the work, will depend upon the situation of the parties at the time, the nature of the services to be performed, and all the circumstances pertaining to the particular case. Whether the servant is expected, immediately, to enter into the discharge of the work in the place as it then exists, or exercise his own judgment in preparing the place in which to do the work, are questions of fact to be determined from the nature of the work to be done, and all the circumstances pertaining to the surroundings. If the situation of the parties at the time, the nature of the service, the place of the work, and the circumstances pertaining to the work, are such that reasonably prudent men would have concluded that the master intended the servant to use the premises as they then existed, in which to do the work, the master will be liable for injuries resulting to the servant on account of the unsafe place in which to do the work. If in the same case reasonably intelligent men may come to different conclusions on the question of the intent of the master for the servant to rely on the employer to furnish a reasonably safe place in which to do the work, the question becomes one of fact for the jury. In determining the question of fact between the parties. the jury is to be guided by what it may conclude that reasonably prudent men would have intended under like circumstances. Barnsdale Oil Co.

v. Ohler, 48 Okla. 651, 150 Pac. 98; Consumers Gas. Co. v. O'Bannon, 94 Okla. 107, 221 Pac. 423; Sulzberger & Sons v. Castleberry, 40 Okla. 613, 139 Pac. 837; Cosden Pipe Line Co. v. Berry, 87 Okla. 237, 210 Pac. 141; Petroleum Iron Works v. Wantland, 28 Okla. 481, 114 Pac. 717; Cushing Gasoline Co. v. Hutchins, 93 Okla. 13, 219 Pac. 408.

Superintendent Jones was in charge of the construction work, and is charged as a matter of law with being informed of the means and appliances afforded the servants to perform their work. The two employees were standing near, and in sight of the form from which the concrete was running, at the time Jones came to where they were standing. Jones could see that the scaffolding had been removed, and could also see that the distance from the scaffolding to the concrete form was some 7 or 8 feet. There may be some doubt as to whether J. B. Crabb could have stopped a leak in the form above the top of the brace while standing on a scaffold on the level with the second floor, but this situation was clear to the view of Jones. He could see that the concrete was of a thin mixture, and likely to run freely from the openings, thus impairing the strength of the beams. Jones knew that he had not ordered the making of any ladders of sufficient length to reach from the floor of the basement, a distance of about 25 feet, to the form in question. The evidence shows that it would have taken about 30 minutes for two of the 16-foot ladders to be nailed together for reaching the distance. Jones could see that the only existing means for reaching the leak from which Crabb fell was to climb on the brace, which was nailed to the form below the leak. Jones testified that he had observed employees on braces to the concrete forms in the course of their work on the building. Jones testified that when he saw men on a high brace "like that," he did not say anything to them, as "we nail them extra heavy." In view of the fact that the employees might be required to climb on to them. In this situation Jones testified, "I told them to go up there and fix those leaks."

The question of fact involved is whether Jones intended for the decedent to use the brace as a support to chink the opening situated above where the brace was nailed to the form; whether Jones intended for the decedent to use the then existing means for reaching the opening. The direction was in the nature of a command, that operated to call for immediate action in view of all the

circumstances of the case. The thin mixture of concrete was running from the openings, which would seriously impair the strength of the beam, if it continued to run for any great period of time. Whether the decedent could have reached the opening from a replaced scaffolding presents a question involving some doubt. If the superintendent intended for the decedent to proceed with the work immediately, the brace which broke with him presented the only existing means for reaching the opening from which he fell and was injured. We think that men of reasonable intelligence, at least, may differ on the question as to whether Jones intended for the decedent to use the brace as a support for chinking the opening from which he fell. The question then becomes one of fact for the jury to determine from all of the circumstances pertaining to the accident under proper instructions of the court.

The plaintiff contends that the defendant in error was required under the provision of section 7270, C. O. S. 1921, to lay a temporary floor, even with the second floor, over the opening through which the decedent fell; that the failure of the defendant in error to comply with the statutory provision was the proximate cause of the injury to the employee; that if a temporary floor had been placed over the opening, level with the second floor, the employee would not have fallen for a greater distance than 8 feet.

The section reads in the following language:

"Temporary Flooring in Steel Frame Buildings. If, in the erection of any iron or steel framed building, the **spaces** between the girders or floor beams of any floor are not filled or covered by the permanent construction of said floors before another story is added to the building, a close plank flooring shall be placed and maintained over **such spaces** during the construction of each story, from the time when the beams or girders are placed in position; but openings protected by a strong hand railing not less than four feet high may be left through **said floors** for the passage of workmen and material."

The phrase "such spaces" refers to the open space between girders, or floor beams of the floor as referred to in the first part of the section. The phrase "such spaces" does not refer to an open space resulting from a failure to extend a permanent floor entirely across the building. The closing part of the section refers to placing hand rails around open spaces through said floors. The phrase "said floors" refers to perma-

nent floors provided for by the plans and specifications, and the opening means the open spaces between the floor beam or girders provided for supporting a permanent floor, as required by the plans and specifications. The section does not refer to openings, or spaces resulting from a failure to extend a permanent floor entirely across the building. A contractor or builder is not required by the statute temporarily to floor an open space which results from the plans and specifications not requiring a permanent floor to be extended entirely across the building.

The question of what protection, if any, should be afforded the employees in relation to the open space, under the common-law rules, which require the master to provide a reasonably safe place for the servant to do his work, is not considered. Our expressions are confined to the things required of the builder in relation to open spaces through a floor according to section 7270, supra. The plans and specifications did not require the laying of a permanent floor at the point where the decedent fell, and the statute by its terms does not require the builder or contractor to lay a temporary floor over such open spaces. The builder or contractor is required by the statute to place a temporary floor over spaces between girders or beams which are placed for carrying a permanent floor according to the plans and specifications. The question has not been before the court heretofore; it would serve no useful purpose to cite authorities on this question contained in the briefs of the parties to this action, for the reason that the cases are not in point.

The appellant assigns the action of the trial court in overruling her challenge for cause of J. T. Maledon to sit as a juror in the trial of the cause as error. The voir dire examination of the juror disclosed that he then owned and held stock in the defendant corporation. He was not qualified to sit as a juror in the trial of this case; the court committed error in overruling the challenge for cause. Putnam v. Pacific Monthly Co. (Ore.) 130 Pac. 986; Martin v. Farm Mutual Ins. Co. (Mich.) 102 N. W. 656; Page v. Contoocook Valley Ry. Co., 21 N. H. 438; McLaughlin v. Louisville Elec. Light Co. (Ky.) 37 S. W. 851; Featherston v. Lowell Cotton Mills Co. (N. C.) 74 S. E. 918; City of Guthrie v. Shaffer. 7 Okla. 459, 54 Pac. 698; Caroline Gibson, Adm'x, v. City of Wyandotte, 20 Kan. 156.

The plaintiff in error seeks to recover special damages on account of the defendant taking the employee from the plant at Harrah, Okla., to Oklahoma City and placing him in St. Anthony's Hospital. The plaintiff testified that she requested that her husband be taken to a hospital at Shawnee; that she was required to pay her expenses at the hotel in Oklahoma City on account of her husband being taken to a hospital at the latter place. The employee was seriously injured and required immediate medical attention. The defendant in error was authorized to exercise its judgment in selecting the hospital to which it carried the employee for treatment. Defendant in error would not be liable for damages in the selection of a hospital for the treatment of the employee, if it exercised reasonable care in selecting a suitable hospital, equipped to render the necessary medical aid. The general superintendent of the defendant was on the ground and informed of the nature and extent of the employee's injuries. He was in a better position to determine the disposition to be made of the case than the wife, who was uninformed about the injury. The record discloses that the employee was in urgent need of immediate medical attention. The plaintiff does not complain of lack of attention, or inefficient medical attention being given to her husband in the hospital to which he was taken. If the next of kin are on the ground and prepared to take charge of the injured employee, or they have some person on the ground properly prepared to take charge of the employee within a reasonable time after the injury, the privilege and right should be accorded the next of kin, but the employer will not be responsible for improper treatment given the injured employee.

The cause is reversed and remanded for further proceedings in accordance with the views herein expressed.

By the Court: It is so ordered.

Note.—See under (1) 39 C. J. p. 308, §441; anno. 26 L. R. A. 524; 41 L. R. A. 50; 25 L. R. A. (N. S.) 321; 28 L. R. A. (N. S.) 1267; 46 L. R. A. (N. S.) 769; 18 R. C. L. p. 594; 3 R. C. L. Supp. p. 828; 4 R. C. L. Supp. p. 1198; 5 R. C. L. Supp. p. 993. (2) 29 Cyc. p. 630. (3) 39 C. J. p. 352. §471. (4) 35 C. J. p. 314, §326. (5) 39 C. J. p. 241, §348. (6) 4 C. J. p. 1164, §3182; 39 C. J. p. 1107. §1302.