## GRIFFIN GROCERY CO. v. SCROGGINS.

No. 18618. Opinion Filed Jan. 28, 1930.

Rehearing Denied Sept. 9, 1930.

Ross & Thurman and Linebaugh & Pinson, for plaintiff in error.

Rufe Scott, Thomas J. Wiley, and Harry G. Davis, for defendant in error.

LEACH, C. This is an appeal by Griffin Grocery Company, who was defendant in the trial court, from a judgment in the district court of Muskogee county, in favor of Inez Scroggins, a minor, for damages arising out of personal injuries to Arthur Scrog gins, while employed by the defendant, which resulted in his death. The parties will be referred to herein as they appeared in the trial court.

The first assignment of error presented and argued in the brief of the defendant, Griffin Grocery Company, is that the trial court erred in overruling defendant's motion to make plaintiff's petition more definite and certain. The plaintiff alleged, in part and in substance, in her petition, that she was an infant of the age of four years, the only child and sole heir of Arthur Scroggins, deceased, who was 29 years of age and was capable of earning and did earn $175 per month; that she, plaintiff, was wholly dependent and did rely on the deceased for her support, maintenance, and education; that no administrator had been appointed for the estate of the deceased, and quoting from her petition, it is alleged:

"3. That on or about the 29th day of September, 1925, the said Arthur Scroggins was employed by the Griffin Grocery Company, a corporation of Muskogee, Okla., defendant herein, as a carpenter for the purpose of repairing the four-story building of said defendant in the city of Muskogee, located at No. 111 South Cherokee street, said city, and was required, among other things, to hoist on an elevator lumber from the ground floor of said building to the fourth floor thereof, in an elevator run and controlled by electricity, provided by the defendant; that said Arthur Scroggins was not experienced in operating elevators, in fact, knew nothing about operating elevators, of the proper equipment for elevators, or what was necessary to be furnished for safety to the users or operators thereof, and said Arthur Scroggins relied wholly upon the defendant for his own safety in operating said elevator, all of which was known to the defendant.

"4. That the defendant wholly disregarding its duty, negligently and carelessly permitted and directed the said Arthur Scroggins to operate said elevator without informing him that said work was in any wise dangerous to an unskilled or inexperienced workman, and did not furnish said Arthur Scroggins a safe place in which to work, or an elevator equipped in a safe manner for operation, and did not instruct said Arthur Scroggins as to the proper manner to operate said elevator, and did not provide proper guards for said elevator to properly protect the life of said Arthur Scroggins, and did not furnish an elevator equipped with such guards as are and were required by orders of State Factory Inspector of the state of Oklahoma, all of which defendant should have done.

"5. Plaintiff further states that the operation of an electric control elevator and especially an elevator without proper guards-

was dangerous and required skill and experience on the part of the operator and was not such work as an employee to do carpenter work or a carpenter without special experience which the said Arthur Scroggins did not have, should have been required to do, which was known to the defendant and was not known to the said Arthur Scroggins.

"6. That on the 29th day of September, 1925, while hoisting lumber on said elevator from the first floor to the fourth floor of said building, at and under the direction of the defendant, the said Arthur Scroggins in attempting to operate said electric control elevator was caught between the floor of the third floor of said building and the bottom floor of said elevator, without negligence on his part, and his body was crushed and he was painfully and severely injured from which injury he died on October 1, 1925, although he was immediately taken to the Baptist Hospital in Muskogee, Okla., after said injury and received medical treatment.

"7. * * * That on account of the wrongful death of the said Arthur Scroggins caused by the carelessness and negligence of the defendant, this plaintiff has suffered damages in the sum of $30,000."

The defendant's motion to make plaintiff's petition more definite and certain calls attention to that part or paragraph of the petition which refers to the operation of the elevator and failure of plaintiff in error to properly equip the same in a safe manner with proper guards, and moved the court to require the plaintiff to make her petition more definite and certain by alleging the facts claimed by her instead of the conclusions stated in the petition.

Section 298, C. O. S. 1921, provides, in part:

"* * *When the allegations of a pleading are so indefinite and uncertain that the precise nature of the charge or defense is not apparent, the court may require the pleading to be made definite and certain by amendment."

The defendant, in support of its first assignment, cites Smith v. Board of Com'rs of Rogers County, 26 Okla. 819, 110 Pac. 669, and Swarts v. State, 70 Okla. 205, 174 Pac. 255. The case of Smith v. Board of Com'rs of Rogers County did not involve a motion to make the petition more definite and certain, but it was held therein that a petition was subject to demurrer where it merely stated conclusions and failed to contain a positive statement of essential facts. The other case, Swarts v. State, supra, was an action against a court clerk and the sureties on his official bond for alleged failure to account for and pay over certain sums

collected at various times from divers sources, and it was there held that the motion to make the petition more definite and certain so as to allege the names of the persons from whom the money had been collected, in what cases such funds had been collected and retained, and to whom the funds belonged, should have been sustained, the court being of the opinion that the complaining party had been prejudiced by the action and ruling of the trial court in that the defendants were not in position to fully prepare for a proper trial of the case.

The defendant's motion to make the petition more definite and certain in the instant case is of itself somewhat indefinite and broad in that it merely moves the court to require the plaintiff to make her petition more definite and certain by alleging facts instead of conclusions (Henry v. Gulf Coast Drilling Co., 56 Okla. 604, 156 Pac. 321), but it apparently was directed chiefly at the failure to allege wherein the elevator referred to was not equipped with proper guards. No evidence was admitted as to any guards required by order of the State Factory Inspector, and as to the allegation on that point in the petition it became immaterial. It would have been better pleading, we think, to have alleged to some extent the nature of the guards referred to in the allegations of the petition, but failure of the court to sustain the motion, considering it as applicable and directed at specific allegations, or to all allegations in the petition based on conclusion, did not, as we view it, from all consideration of the record, materially prejudice the rights of the defendant or prevent it from properly presenting its defense in the action.

"A motion to make more definite and certain is addressed to the sound discretion of the court, and a ruling thereon in the absence of an abuse of such discretion that results prejudicially to the party complaining will not be disturbed." City of Lawton v. Hills, 53 Okla. 243, 156 Pac. 297; Fox v. Fox, 117 Okla. 46, 245 Pac. 641.

"A motion to make more definite and certain is addressed largely to the discretion of the court; and its ruling thereon will not be reversed, except for the abuse of such discretion that results prejudicially to the complaining party. And where the facts sought by such motion are within the knowledge and possession of the movant, it is not error to overrule the same." Schaff, Rec., v. Coyle, 121 Okla. 228, 249 Pac. 947.

Section 319, C. O. S. 1921, provides:

"The court, in every stage of action, must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party;

and no judgment shall be reversed or affected by reason of such error or defect."

The defendant states generally in its brief that it was prejudiced by the failure of the court to sustain its motion, but we are unable to see where such statement is borne out by the record, and we find no reversible error in the ruling and action of the court under the first presented assignment of error.

The defendant assigns error in the overruling of its demurrer to the petition of the plaintiff, the same being its third assignment of error; likewise, under assignments Nos. 4 and 5, error is alleged in the action and ruling of the trial court in overruling its motion for judgment on the pleadings and the opening statement of counsel for plaintiff, and in overruling its objection to the introduction of evidence by the plaintiff. The defendant's demurrer was a general one, also its motion for judgment on the pleadings was in effect a general demurrer. Shaw, State Auditor, v. Grumbine, 137 Okla. 95, 278 Pac. 311. The last three assignments of error referred to are based on the alleged insufficiency of the petition and opening statement of counsel for plaintiff to state a cause of action against the defendant. They, together with certain other assignments of error, are presented and argued in the brief of defendant under the general proposition:

"No act or omission on the part of the defendant was either alleged or proven to have had any causal connection with the accident resulting in the death of Arthur Scroggins."

Defendant cites several cases, among them being Chicago, R. I. & P. Ry. Co. v. Perkins, 115 Okla. 233, 242 Pac. 535, wherein it is said:

"This court has, in a long line of cases, held that to constitute actionable negligence three essential elements are necessary: First, the existence of a duty on the part of the defendant to protect the plaintiff from injury; second, the failure of the defendant to perform that duty; third, injury to the plaintiff resulting from such failure. This formula is taken from the case of C., R. I. & P. Ry. v. Duran, 38 Okla. 719, 139 Pac. 876, and has been followed in other cases from this court. * * * In many of the foregoing cases it has been held that, where the petition and the evidence both fail to allege and prove any one of the elements of actionable negligence, it is a question of law for the court, and that the court should direct a verdict for the defendant."

The defendant concedes in its brief that plaintiff's petition alleged facts sufficient to charge the first essential element of action-

able negligence, and possibly charged a breach of duty owed by the defendant to the injured employee so as to make the petition good in that respect as against a demurrer, and thereby plead the second essential element of actionable negligence, but asserts that the petition wholly fails to state facts showing that the fatal accident to the employee was the result of any act or omission of duty on the part of defendant, and that therefore one of the essential elements of actionable negligence was omitted from the petition, and for that reason was subject to demurrer.

It will be observed from an examination of plaintiff's petition that it alleges the employment of Arthur Scroggins by the defendant and a breach of duty on the part of defendant toward him in failing to provide a safe place to work and in failing to advise him how to operate the elevator, and, it was further alleged in paragraph 6:

"That, on the 29th day of September, 1925, while hoisting lumber on said elevator from the first floor to the fourth floor of said building, at and under the direction of the defendant, the said Arthur Scroggins in attempting to operate said electric control elevator was caught between the floor of the third floor of said building and the bottom floor of said elevator, without negligence on his part, and his body was crushed and he was painfully and severely injured from which injury he died on October 1, 1925"

—and in paragraph 7, after alleging the relationship and dependency of the plaintiff to deceased, the age and earning capacity of the employee at the time of his injury, it is further alleged:

"That on account of the wrongful death of the said Arthur Scroggins caused by the carelessness and negligence of the defendant, this plaintiff has suffered damages in the sum of $30,000."

"It is a well-established principle of pleading that there need be no direct allegation of a fact if the same otherwise sufficiently appears, or of a fact which is necessarily implied from other averments in the petition." Revel v. Pruitt, 42 Okla. 696, 142 Pac. 1019.

"Defendant's demurrer to plaintiff's petition, and defendant's objection to the introduction of evidence by plaintiff in support of his petition on the ground that the petition does not state facts sufficient to authorize a recovery, for the purpose of consideration of such demurrer and objection, admit the truth of the allegations and the logical and rational inferences to be drawn therefrom; and both are properly overruled where the allegations and logical and rational inferences to be drawn therefrom will

authorize a recovery." St. Louis & S. F. R. R. Co. v. Bateman, 112 Okla. 86, 240 Pac. 110.

"Pleadings attacked by demurrer should be liberally construed in favor of the pleader where material allegations are merely defectively stated and not wholly omitted." Traber v. House, 112 Okla. 273, 240 Pac. 729.

Section 294, C. O. S. 1921, provides:

"In the construction of any pleadings, for the purpose of determining its effect, its allegations shall be liberally construed, with a view to substantial justice between the parties."

Considering plaintiff's petition as a whole, in the light of the rules in the foregoing cases and statute, we are of the opinion that it alleged facts sufficient to show, or from which it may be reasonably inferred, that the injuries suffered by the employee resulting in his death were caused or arose from the negligent acts or omissions of duty on the part of defendant by reason of which the plaintiff suffered damage, and for that reason the petition was good as against the general demurrer.

We find no reversible error in the action of the trial court in overruling defendant's demurrer and other objections by motions based on the insufficiency of plaintiff's petition.

The defendant's sixth and seventh assignments of error allege error in the overruling of defendant's demurrer to plaintiff's evidence and in refusing defendant's motion to instruct the jury to return a verdict for the defendant at the close of all the evidence. These assignments of error, together with others not specifically set out herein, are based on the insufficiency of plaintiff's evidence to establish a cause of action in favor of the plaintiff and against the defendant, and it is contended that the evidence does not support the verdict. These assignments are likewise presented by defendant under its general proposition that:

"No act or omission on the part of the defendant was either alleged or proven to have had any causal connection with the accident which resulted in the death of Arthur Scroggins."

This assignment necessitates an examination and consideration of the evidence. The plant of the defendant where the accident happened was a three-story building with a basement. The employee was injured on or by an electrically driven freight elevator, capable of lifting 2,500 pounds, controlled or operated by a cable extending the length of the elevator shaft and coming up through the floor in one corner of the cage or elevator; a pull on the rope down or up would cause the elevator to ascend or descend. At the time of the accident the defendant company was installing a cooling room on the third floor and some coffee tables on the second floor of its building and the elevator was used to hoist building material for such improvement and for other purposes as will be observed from the quoted testimony.

E. J. Maples, called as a witness by plaintiff, testified, in effect, that he had known Arthur Scroggins during his lifetime for about 23 or 24 years; that he was about 5 or 6 years old when he first knew him; that Scroggins lived about 12 miles from the witness and on an adjoining farm from him in Stone county, Mo. The witness was asked and answered:

"Q. What was Arthur Scroggins' occupation? A. Well, most of his life, just farming. Q. Did you ever know of him doing any other kind of work? A. I don't believe I ever did. Just farming and day laborer. Common laborer."

There was some other testimony of the particular witness, and another to the effect that deceased made a crop in Missouri in the spring preceding his injury and death, and that he served in the U. S. Army or Navy on the Mexico Border and during the World War.

H. E. Lienback, after stating his age; residence; that he was a carpenter of 25 years' experience and was hired as a foreman to build a cooling room on the third floor of the defendant's building, testified in part as follows:

"Q. Did any other workmen help you in any way? A. Yes, sir. Q. Who employed the other workmen at that time? A. Mr. Davis. Q. Do you know what connection Mr. Davis had with the Griffin Grocery Company? A. I understood that he was the manager. Q. Were you acquainted with a man by the name of Arthur Scroggins? A. Yes, sir. Q. What was the occasion of your meeting him? A. Mr. Davis brought him and three other men up to help where I needed them. Q. Was there a hoist or freight elevator in the building? A. Yes, sir. Q. How was that used? A. Everybody used it for freight and some used it to go up and down on.. Q. Did you have any conversation with Mr. Davis with reference to the use of the elevator about the work? A. He told me to get my material up and down, whatever I needed. Q. Use the elevator for that purpose? A. Yes, sir. Any operator on the elevator? A. No, sir. Q. Did the man who used it, operate it? A. Yes, sir. The one who was using it operated it. Q. Do you know whether or not there was a

control or appliance to stop the elevator by on it? A. There was a little lever right close to the rope, and you push it out, one way or the other, and it was supposed to lock the elevator so it would stay. Q. Then you couldn't operate it? A. Yes, sir. Q. What was the condition of that? A. It wouldn't work. Q. Had you tried to use it? A. Yes, sir. When I instructed the men to run the elevator. Q. In using the elevator, did you have any difficulty in going up and down? A. It stuck once or twice, as I remember. Q. Where would it stick? A. Between the first and second floors. Q. What was done at that time? A. I called Mr. Redpath, the mechanic, and he went up to the drum, and there was a noise and after that it worked all right. Q. Was there any gates on the elevator? A. Yes, sir. Q. What was the condition of the gates? A. On the first floor there was no gate, it fell apart and lay on the floor on the north side of the elevator and the second floor had two slats off. Q. How was it that the gate worked on the second floor? A. Just pull it up and stick a prop under it. Q. Was it necessary to do that in order to hold the gate on the second floor? A. Sometimes it was and sometimes not. Sometimes it would go down and sometimes it would stick. Q. When the men were brought by Mr. Davis to you, who directed them what to do? A. I did. Q. Do you remember the occasion of the accident to Mr. Scroggins there? A. Yes, sir. Q. Where were you at that time? A. In the cooling room. Q. Just tell the jury what attracted your attention first? A. The first thing that attracted my attention, I was nailing up cork on the wall and I heard some screams, some girls screamed, and I ran out to the door, the elevator was in front of the door, and I ran over there and saw the man crushed between the floor and the elevator. Q. Where was Arthur Scroggins at that time? A. On the east side of the elevator, about half the distance from the south opening of the elevator, his body pinned between the floor and the elevator. Q. Had you given him any directions immediately before the accident? Tell him to do any particular work? A. I sent him down to bring up some lumber from the yard and put it on the second floor. Q. Was he using the elevator for that? A. Yes. sir. Q. When the accident occurred, state whether or not there was any lumber or any boards that were similar to what you ordered——. A. Yes, sir. One piece of one by four about twelve feet or sixteen feet long. Q. What was the condition of that board immediately after the accident? A. It was broken into two or three pieces. Q. Had you given any special directions to Mr. Scroggins with reference to the use of the elevator or hoist? A. Yes. I showed him how to pull the rope and go up or down. Q. How wide was that elevator? A. About eight feet. Q. How high was the elevator from the floor to the top of the hoist? A. About eight feet, I would

judge. Q. By what means could you take boards up or down? A. You could let the elevator down and there was screens over the top of the elevator, three sections, the middle one was stationary and the two ends could be thrown back on hinges, and let the elevator down below the top and shove the boards down and let them lean over the top. Q. Through the screen? A. Yes, sir. Q. Would the boards be standing straight in the elevator or at an angle? A. At an angle. Leaning toward the rope. Q. In operating the elevator, if it were stopped on the second floor and was empty and you desired the use of the elevator on the first floor, the elevator standing still on the third floor, how could you get the elevator down to the first floor? A. Call up the elevator shaft. There was a bell, but it wouldn't work. Q. Was the bell used to give warning that you were going to use the elevator? A. Yes, sir. Q. What was the condition of the bell? A. It wouldn't ring, so you would just call up the elevator shaft, and if no answer you would start it and if no one caught it, it would run all the way down. Q. you stated a while ago that there was a lock device that wouldn't work. Had that locking device worked—when it did work could you start the elevator up or down if it was locked? A. If it had been on, you couldn't."

Cross-examination:

"Q. Was the lumber that was placed on the second floor all one by fours? A. There was some one by fours, some two by fours, and some four by fours. Q. You stated that after the accident you saw some one by fours broken in one, two or three pieces. A. Yes, sir. Q. Where did you see them? A. One piece laying on the elevator. Q. How long was it? A. Somewhere between 12 and 14 feet, broken up in pieces. Q. Where did you see the other pieces? A. Right down in the basement, laying down in the pit below. Q. You stated that you gave Arthur Scroggins instructions to place some lumber on the second floor the last time you saw him before the accident, is that right? A. Yes, sir. Q. How long was it before the accident that you gave him those instructions? A. When he came back right after lunch. About two hours. Q. What time did the accident happen? A. Sometime close to three o'clock, I am not sure."

Redirect examination:

"Q. You stated in your cross-examination that in taking lumber off the elevator on the second floor, the elevator was stopped between the first floor and the second floor, will you explain why it was necessary to do that? A. So you could reach in there and pull the lumber out of there. Q. Referring to the position of the body of Arthur Scroggins at the time of the accident, state whether or not the floor of the elevator was above or below the third floor of the building when you found him at the time of the accident.

A. Below the third floor. Q. About how far? A. Something like, just about three inches below, with the body crushed in between. Q. The body was crushed in between the hoist and the third floor. A. Yes, sir. Crushed between the bottom of the floor and the edge of the elevator floor, here (indicating on the diagram Ex. 1)."

R. M. Richardson, a witness, testified, in part and substance, that he was working at the plant of the defendant company at the time Arthur Scroggins was injured; that he used the elevator to take lumber up to the third floor of the building; was directed what to do by Mr. Lienback; that he never observed the elevator failed to work; anybody that wanted to use it did so; never saw any regular operator on the elevator.

"Q. What length of lumber could you carry on that elevator? A. I don't just remember, about twelve or sixteen feet, two by fours. Q. How would you load lumber in the elevator? A. Run it down to the basement below the first floor and then stand the lumber up in it, or down in it, and then go around and start the elevator and let it go where you wanted to unload. Q. Take it out the door? A. No, the door was down about half way. Q. From what part of the elevator would you take the lumber out? A. Top of the elevator. Q. Was the elevator used quite frequently? A. Yes, sir. It was used all the time nearly. Q. Those working with you used it? A. Yes. Some of them working with me used it, but the wholesale house and grocery department used it most, used it most all the time."

On cross-examination, witness testified there was a switch on the side of the elevator that could be turned off to prevent the elevator operating; that he used that switch. On redirect examination, witness was asked if he saw a bell, presumably meaning a bell on the elevator, and he stated he did not observe any—

"Q. Suppose you were on the first floor and the elevator was on the third floor and you wanted to use it, what would you do? A. I would holler to them and say 'elevator,' or something like that. All of them did that. Holler up the elevator shaft, then wait a minute and then pull the cable when they wanted the elevator."

Mr. Griffin, president and general manager of the defendant company, testified that he bought and had installed the Otis elevator used in the building of the defendant; that it was a regular pattern model freight elevator equipped with safety devices; that it had never been out of order so far as he knew; didn't know of the condition of the elevator at the time of the injury; he stated that the candy department girls got to running the elevator up and down riding on it; that he caused a statement signed by him to be placed in the elevator showing who had authority to use it, and that he placed the elevator in charge of the chief clerk.

John Redpath testified that he was maintenance engineer for the defendant company; that he ran the elevator between the second and third floors on the day preceding the accident, also operated it on the day after the accident, and did not observe anything wrong with it; that it apparently operated all right; did not fix or repair the elevator at the request of Mr. Lienback. He further testified:

"Q. At the time of the accident, state whether or not any damage was done to the gate on the second floor, to the gates of the elevator on the second floor. A. Yes, sir, there was some damage done to it. Q. What damage was done? A. We kicked the slats out, with the exception of what were broken out by the man, some few, not all of them. There was a few that the man broke himself when he was caught in the elevator. Q. What would happen to the gate on the first floor if you moved the elevator on to the second floor? A. If the gate was up, it would close. Q. Come down, with the bottom of the gate against the floor? A. Yes, sir. Q. What would happen to the gate on the second floor? A. It would stand still unless the operator opened it. Q. If the operator pulled it up to the top, was there any appliance there to catch it and hold it there? A. Yes, sir, there is. Q. Then, if you moved the elevator with the gate left up and go on up to the third floor, what would happen to the gate? A. As the elevator went up or down, the gate would come down. Q. You say on the first floor and the second floor, when the elevator starts moving, the gate would come back down to the floor? A. Yes, sir. Q. And go down with a drop as the elevator went up? A. Yes, sir, down with a drop. Q. Was it counterbalanced with weights? A. Yes, sir, it was counterbalanced."

C. D. James was called on behalf of the defendant, and testified that he was employed by the defendant company at the time of the injury to Arthur Scroggins; that he had used the elevator 15 or 20 minutes before the accident in moving goods from the third floor of the building to the first floor; moved considerable material that day, about a carload of starch—

"Q. When the elevator was on the third floor, you simply caught hold of the rope and pulled it if you wanted the elevator to come down? A. I would holler up the elevator shaft, 'elevator,' and if no answer, I would pull it down. Q. It was not necessary for

you to unlock any device or turn any switch, just pull the rope and the elevator would come down? A. Yes, sir."

Much detail testimony, not quoted herein, was given, principally concerning the condition, repair, and manner of operation of the doors at the several openings to the elevator shaft which tended, in part, to show that such doors were intended and did, under some conditions, when in proper order, operate automatically. The defendant, after discussing its view of the evidence and what inferences it deems might reasonably be drawn therefrom, cites the case of Lakey, Adm'x, v. North McAlester Coal Co., 98 Okla. 130, 224 Pac. 309, wherein it was said:

"In the trial of a personal injury case, proof of injury is not enough; the plaintiff must go further and offer proof of some fact or circumstance from which it might reasonably be inferred that the defendant was in some way to blame for the injury" —together with other cases which announce a similar rule. The case of Chicago, R. I. & P. Ry. Co. v. Duran, 38 Okla. 719, 134 Pac. 876, is cited, which opinion quotes extensively from other decisions which lay down the general rules of law relative to personal injury suits. The following quotation from the body of that opinion, however, will show to some extent the difference between the nature and cause of the injury there involved and the instant case, and the reason for the conclusions of law reached:

"The fact that the track had been washed out by the recent floods and the roadbed was thereby put in a dilapidated condition could not be the proximate cause of a piece of limestone or other ballast rock flying into the eye of the plaintiff, on account of being tamped with a pick or such appropriate tool. The flying of such rock or ballast material into the eye obviously was an accident and a danger incident to the employment, which as a matter of law was assumed by the defendant."

The cases of Schaff v. Ferry, 105 Okla. 259, 232 Pac. 407; Chicago, R. I. & P. Ry. Co. v. Pedigo, 102 Okla. 72, 226 Pac. 72; Davis v. Lawson, 118 Okla. 94, 246 Pac. 853; Eastern Torpedo of Ohio Co. v. Shelts, 121 Okla. 129, 247 Pac. 974; Wiley v. Wigg, 124 Okla. 30, 254 Pac. 22; Hepner v. Quapaw Gas Co., 92 Okla. 9, 217 Pac. 438, with decisions from other jurisdictions, are cited, wherein it is stated that a verdict based on conjecture, surmise, or speculation cannot be sustained, and that where the evidence, as shown in those particular cases, is insufficient to establish the fact sought to be proven or fails to show a causal connection be-

tween the alleged negligence and the injury complained of, a judgment thereon cannot be sustained, and it is the duty of the trial court to instruct the jury to return a verdict in favor of the defendant. The cases announce the general and well-established principles of law applicable to personal injury suits as applied to the facts in each particular case. The difficulty in the instant case as well as in most of such actions, is to properly apply the well-established rules of law to the facts. It is stated in the body of the opinion of Clark v. St. L. & S. F. R. Co., 24 Okla. 764, 108 Pac. 361:

"In all lawsuits, and particularly personal injury cases, a slight difference between the exact facts of cases claimed to be analogous makes a wide difference in the application of the law of one case to the facts of another. Every case therefore must depend more or less upon its own circumstances."

The defendant concludes that since the injured employee had served in the U. S. Navy, he must have had experience with elevators in loading and unloading supplies on the ships where he served. On the question as to whether the injured employee had had experience in the operation of electric elevators, such as the one here involved, we think there well might arise a different conclusion or opinion from that advanced by the defendant. A witness who had known the injured practically all his life said the employee had farmed most of his life and was a common laborer. The extent of the testimony as to instructions given the employee, Scroggins, by the foreman in the operation of the elevator, is shown from the following testimony:

"Q. Had you given any special directions to Scroggins with reference to the use of the elevator or hoist? A. Yes, I showed him how to pull the rope and go up and down."

This appears to be the extent of the instructions given the employee respecting the operation of the elevator which he was directed to use in placing lumber on the second floor.

"It is the duty of the master who assigns to an inexperienced servant the operation of a dangerous machine not only to give him warning of the dangers incident to its use, but also to give him instructions sufficient to enable him to fairly comprehend the dangers and to perform the work with reasonable safety with proper care on his part." C., R. I. & P. Ry. Co. v. Hurst, 129 Okla. 1, 263 Pac. 113.

"Where from facts shown by the evidence, although undisputed, reasonable men might

draw different conclusions respecting the question of negligence, the question is properly for the jury." Neversweat Mining Co. v. Ramsey, 84 Okla. 128, 202 Pac. 787; Mitchell v. Aaronson, 91 Okla. 82, 216 Pac. 102.

"It is error for the court to instruct the jury to return a verdict for the defendant in a personal injury case, where the evidence is of such a nature that men of ordinary intelligence may arrive at different conclusions on the issue of fact relating to the responsibility of the defendant for the injury." Crabb v. Okla. Gas & Elec. Co., 120 Okla. 182, 250 Pac. 926.

"The question of negligence, where there is competent evidence introduced from which reasonable men might draw different conclusions, is one for the jury, and, under like circumstances, the question of proximate cause is one for the jury." City of Tulsa v. McIntosh, 90 Okla. 50, 215 Pac. 624.

"It is a settled rule of this state that negligence may be established by circumstantial evidence and the reasonable inferences to be drawn therefrom, and that the proximate cause of injury may be determined from circumstantial evidence." Rock Island Coal Mining Co. v. Galvin, 96 Okla. 95, 220 Pac. 832.

"Where an accident occurs, resulting in death, and there is no direct proof as to how the accident occurred, the manner of its occurrence may be shown by circumstantial evidence, from which the jury may infer the manner and cause of the accident, if the inference is a reasonable, although not necessary, resulting fact.

"Where a person is killed, and there are no eye witnesses to the accident, the plaintiff is entitled to the benefit of the presumption that the deceased did not voluntarily incur danger or the risk of death." Silurian Oil Co. v. Morrell, 71 Okla. 250, 176 Pac. 964.

"Circumstantial evidence in a civil case, in order to be sufficient to sustain a verdict, need not rise to that degree of certainty which will exclude every reasonable conclusion other than the one arrived at by the jury." Marland Refining Co. v. Snider, Adm'r, 125 Okla. 260, 257 Pac. 797.

See, also: St. Louis & S. F. R. R. Co. v. Clampitt, 55 Okla. 686, 154 Pac. 40; St. Louis & S. F. R. Co. v. Darnell, 42 Okla. 394, 141 Pac. 785; Weleetka Cotton Oil Co. v. Brookshire, 65 Okla. 293, 166 Pac. 408; Schaff v. Coyle, 121 Okla. 228, 249 Pac. 947; Campbell v. Breece, 134 Okla. 266, 274 Pac. 1085, as announcing some general principles of law applicable to case at bar.

In the case of Hepner v. Quapaw Gas Co., supra, cited by the defendant, it is stated:

"A verdict must be said to be based on speculation and conjecture when, after considering all the evidence favorable to plaintiff, together with all inferences to be reasonably drawn therefrom, and excluding all evidence favorable to defendant, all unprejudiced minds must agree, from the facts and circumstances in evidence, that any one of several conclusions consistent with nonliability of defendant may as reasonably be drawn therefrom as is the conclusion of liability under plaintiff's theory of the case."

No testimony was given by any person who claimed to have seen the accident, or to know how it occurred prior to discovery of the injured employee.

The defendant predicates error on the failure of the court to give its requested instruction No. 1, wherein it requested the court to instruct the jury that, in reaching a verdict, they must do so upon a fair consideration of the facts and circumstances shown by the evidence, and that the conclusion of the jury could not be based upon mere speculation and conjecture, and that unless the jury could determine from the evidence the manner in which the injuries to deceased were sustained, and the direct cause of the accident and such injuries, without speculation or conjecture, then their verdict must be for the defendant.

We have considered the requested instruction together with the general instructions given, and are of the opinion that the court under the whole instructions given, substantially and correctly advised the jury on the questions of law raised so as to fairly present the case to the jury, and that no error is shown in the refusal to give the requested instruction. Midland Valley R. Co. v. Neeley, 114 Okla. 277, 246 Pac. 859.

We deem it sufficient to say, without setting forth herein a discussion of the evidence and its different phases, that, from an examination of all the evidence and a consideration thereof in the light of the principles of law applicable thereto, as enunciated in the various adjudicated cases cited by the respective parties, a portion of which are quoted from herein, we conclude and are of the opinion that the record in the instant case does not bring it within or require a decision similar to those relied upon by the defendant, wherein it was held, under the record, that the evidence failed to show negligence on the part of the defendant, or establish a causal connection between the established negligence and the injury complained of (Schaff v. Ferry, supra, et al.); but, on the other hand, we are of the opin-

ion and conclude that the evidence is such that reasonable men might reach different conclusions thereon respecting the negligence of the defendant and the causal connection between such negligence and the injury suffered, and falls within that class of cases where the evidence was held sufficient to warrant a submission of the same to a jury. Silurian Oil Co. v. Morreil, supra, et al. We are of the opinion that the evidence was sufficient to warrant the trial court in overruling defendant's demurrer thereto, and in submitting the case to the jury; that the verdict and judgment as entered by the trial court is reasonably supported by the evidence and record.

Finding no reversible error in the record, the judgment of the district court is hereby affirmed.

On motion of the defendant in error, judgment is rendered herein against Griffin Grocery Company, as principal, and Maryland Casualty Company, as surety, on the supersedeas bond filed in the case for the sum of $7,500, with six per cent. interest thereon from February 2, 1927, and the costs of this action.

BENNETT, TEEHEE, and DIFFENDAFFER. Commissioners, concur. HERR, Commissioner, concurs in result. REID and FOSTER, Commissioners, dissent.

By the Court: It is so ordered.

Note.—See under (1) 21 R. C. L. p. 600; 3 R. C. L. Supp. p. 1174; 4 R. C. L. Supp. p. 1422; 5 R. C. L. Supp. p. 1166. (3) 20 R. C. L. p. 180; 7 R. C. L. Supp. p. 670. (4) anno. 14 A. L. R. 1178; 33 A. L. R. 190; 20 R. C. L. p. 166; 3 R. C. L. p. 1040; 4 R. C. L. Supp. p. 1342; 5 R. C. L. Supp. p. 1085; 6 R. C. L. Supp. p. 1195; 7 R. C. L. Supp. p. 669.